UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Glenn JOHNSON,
Defendant-Appellant.

No. 77–5307.

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1978.

Robert B. Wallis, Jan Woodward Fox, Houston, Tex., for defendant-appellant.

J. A. Canales, U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and HIGGINBOTHAM,* District Judge:

HIGGINBOTHAM, District Judge:

Defendant Charles Glenn Johnson was indicted on two counts of conspiring to violate 18 U.S.C. § 1014, four counts of violating 18 U.S.C. § 1014 by making false statements to a federal savings and loan institution, and one count of obstructing justice in violation of 18 U.S.C. § 1503. After a trial lasting over four weeks in which all alleged co-conspirators except his wife testified against him, the jury found Johnson guilty on all seven counts.[1] He was fined $7,000 and sentenced to a total of five years in prison, to be followed by five years' probation. From this judgment, he appeals.

Johnson's complaints fall into three groups. First, he claims that the trial court excluded relevant evidence, preventing a full defense. Second, he contends that there is a variance between the indictment, charging two conspiracies, and the proof, establishing only one. Finally, he urges that his conviction for obstructing justice was based on insufficient evidence and resulted from the trial court's improper jury charge. For the reasons that follow, we reject Johnson's contentions and affirm.

Johnson was an original stockholder in C. J. Limited, Inc. to which he contributed a fully mortgaged piece of property known as Summer Place on Lake Conroe near Houston, Texas. C. J. Limited attempted without success to develop the property in small lots. In the spring of 1975, it changed its sales approach and had the property replatted into approximately 50 tracts of acreage size. When Johnson and his associates were unable to sell any of the larger tracts, they devised a "promotional gimmick" which involved placing tracts in the names of persons who had not actually purchased them in order to create the appearance of genuine sales. These fictional purchasers were assured that the arrangement imposed on them no obligation, including no requirement that they pay for the property.

---

* District Judge of the Northern District of Texas, sitting by designation.

1. Johnson was indicted with his wife, but his motion for severance was granted.

On July 30, 1975, C. J. Limited sold to federally insured Surety Savings Association 25 real estate note packages, each of which purported to represent the right to the proceeds from legitimate sales by C. J. Limited. These packages were the core of an elaborate hoax, for each actually represented a different "nominee purchaser" arrangement from which C. J. Limited was receiving no note payments. Johnson's participation in this transaction, known as the "first closing" was the subject of the conspiracy alleged in Count I of the indictment. The typical note package sold to Surety contained a real estate lien note, a deed of trust securing the note, a contract of sale between C. J. Limited and the dummy purchaser of land, the notice to the customer of the right to rescind the agreement, a loan application and financial statement, an assignment of lien from C. J. Limited to Surety and an amortization schedule showing the monthly payments due on the real estate note. The false real estate contracts included in these packages formed the basis of Counts IV through VI which charged Johnson with using the documents for the purpose of influencing Surety in violation of 18 U.S.C. § 1014.

The individual notes were assigned to Surety by C. J. Limited through an Assignment Agreement which Johnson signed as the corporation's president. In addition, Johnson endorsed each note directly to Surety. Although Recreation World, Inc. and its agent, Larry Parker, acted as broker and received a substantial fee, Surety purchased the packages directly from C. J. Limited.[2]

As a part of its scheme, C. J. Limited requested and received permission to service the notes, that is, to collect the monthly payments and remit to Surety. For a short while, Johnson or one of his associates purchased cashier's checks showing the alleged purchasers to be remitters. This procedure created an impression that C. J. Limited was receiving monthly payments on behalf of Surety. Johnson also induced Transamerica Title Company, the company that issued the title policies on the 25 alleged real estate transactions, to send the policies and the warranty deeds to him rather than to the "purchasers" who would normally receive these documents.

On September 19, 1975, a "second closing" occurred in which C. J. Limited directly assigned four real estate notes to Surety. Johnson again personally endorsed each of the notes directly to Surety and Parker, representing Recreation World, Inc., was again the broker. This second closing was the subject of Count II, the second conspiracy alleged in the indictment. A false real estate sales contract submitted to Surety in that closing formed the basis of Count VII charging the fourth violation of 18 U.S.C. § 1014.

Surety sent out audit verifications to the alleged purchasers after purchasing the bogus notes. C. J. Limited managed to contact most "purchasers" and obtain their signatures. Unfortunately for Johnson, however, one purchaser returned the verification to Surety with the notation that nothing was known about the matter, precipitating an FBI investigation.

At Johnson's trial, the indicted co-conspirators, Robert W. Jeffrey, John D. Everitt, and Jesse F. Horner, and unindicted co-conspirator, Debbie Boettcher, testified extensively for the government. Jeffrey was a major shareholder of C. J. Limited, and Everitt, Horner, and Boettcher were employees. Before Johnson's trial, Jeffrey, Everitt, and Horner all pled guilty. Each witness confirmed that the note packages sold to Surety were false and fraudulent and that the alleged purchasers never made any down payments or monthly payments.

---

2. One of Johnson's defenses at trial was that C. J. Limited actually sold the notes to Parker who in turn transferred them to Surety. The argument was that because Parker is a private individual, Johnson had not violated the statute. The defense was factual in nature and implicitly rejected by the jury's finding of guilt.

Johnson also contended that the trial court excluded evidence relevant to this question, but the only excluded evidence arguably relevant was cumulative of evidence of record. The harsh reality is that it was undisputed that Johnson endorsed each note directly to Surety.

They also testified that Johnson required that a part of the sale proceeds be held in reserve to enable C. J. Limited to simulate monthly payments from lot purchasers to Surety. Deposit slips were "dummied up" to represent receipts from the phony purchasers. Finally, these witnesses stated that although some of the alleged purchasers actually signed some of the documents in the note packages, much of the documentation was forged and none was ever intended to represent a valid obligation.

The witness Boettcher testified that when the Grand Jury investigation began, she was subpoenaed to testify. After receiving her subpoena, she discussed it with Johnson who advised her to consult an attorney. On the way to her lawyer's office and in the presence of the defendant's attorney, Johnson advised Boettcher to tell the truth. That night, however, Johnson who still employed Boettcher, telephoned her and asked that she not tell the Grand Jury anything, especially about who had signed the documents and the real estate packages. Boettcher immediately notified her attorney and, several days after her Grand Jury appearance, she contacted the FBI. Count III of the indictment, charging Johnson with obstruction of justice, is based on this conduct.

### Complicity

Johnson's first argument, that in excluding certain testimony the trial court prevented him from presenting a defense, assumes that the defense he sought to prove is a valid one. He contends that what he calls "complicity" of bank officers and agents renders legal the actions of which he is accused. His argument is based on a two-step interpretation of 18 U.S.C. § 1014: first, the statute requires that a false statement or report be made for the purpose of influencing a savings and loan association; second, Johnson claims that the statement or report must have the capacity to influence the institution. His argument proceeds that if all agents of a savings and loan association who must approve the transaction to which a statement relates actually know that the statement is false, then the statement lacks the capacity to influence the savings and loan.

This facially appealing argument fails close scrutiny, for it misconceives the statute's reach. The relevant portion of 18 U.S.C. § 1014 states:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution, the accounts of which are insured by the Federal Savings Loan Insurance Corporation . . . shall be fined . . . or imprisoned, . . . or both.

The statute represents a consolidation of 13 different sections all containing similar provisions prohibiting the making of false representations to certain banks, agencies, and corporations.[3]

---

**3.** 7 U.S.C. §§ 1026(a), 1514(a) (1940); 12 U.S.C. §§ 596, 981, 1122, 1123, 1138d(a), 1248, 1312, 1313, 1441(a), 1467(a) (1940); 15 U.S.C. § 616(a) (1940). Most of these sections were enacted in the 1930's as a part of the massive legislative effort to revitalize the economy and protect investors. *See, e. g.,* 78 Cong.Rec. 11931, 11973 (1934). The legislative history of these sections sheds no light on Congress' purpose. There is no direct evidence that Congress intended them to sweep broadly and include all false statements made with the intent of influencing a named institution or that it perceived them as having a narrow scope, covering only those statements on which the institutions actually rely. Congress' purpose may be inferred, but with little force, from the statute's place in the overall legislative scheme. Under the legislative plan, a number of corpo-

rations and agencies were created which backed with federal funds various investment and lending institutions. The precursors to § 1014 thus were fashioned to protect the federal treasury—not just the institutions it insured. It is consistent with § 1014's apparently broad purpose to read the statute in such a manner that the participation of an insured institution in the fraud does not render the fraud legal. That is not to say that when congressional history reveals only the broadest of objectives that it provides material aid in deciding the means to achieve those objectives. With such broadly stated purposes, the means are myriad. Yet our present reading of the statute is not inconsistent with the statute's general objective and the unsuccessful search for legislative guidance has provided assurance because in this decision "we have . . .

Courts have construed § 1014 as prohibiting the making of a false statement to a federally insured banking institution, regardless of the statement's impact. The focus of the offense is on the defendant's intent rather than on the victim. *United States v. Simmons*, 503 F.2d 831, 835 (5th Cir. 1974); *United States v. Baity*, 489 F.2d 256 (5th Cir. 1973); *United States v. Sabatino*, 485 F.2d 540 (2nd Cir. 1973). The phrase "for the purpose of influencing *in any way*" defines the intent required to accompany a false statement and defines it broadly. It draws under its purview not only a defendant who intends to defraud an unwitting insured institution but also a defendant who intends to cooperate with the institution in a scheme requiring him, with the institution's knowledge, to make false statements for the furtherance of the scheme. The savings and loan's awareness of the fraud is not relevant, for its existence is not inconsistent with the intent to influence which a violator of § 1014 must possess. Thus, this collection of facts labeled "complicity" is not a defense to a charged violation of 18 U.S.C. § 1014.

This court's rejection of Johnson's theory follows logically from earlier opinions of this and other circuits. Courts, emphasizing that the intent of the actor is primary, have long held that the government need not demonstrate that the insured institution actually relied on the fraud. *United States v. Baity, supra; United States v. Goberman*, 458 F.2d 226 (3rd Cir. 1972). In *Kay v. United States*, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938), one of the earliest cases construing the statute, the Supreme Court stated:

It does not lie with one knowingly making false statements with intent to mislead . . . to say that the statements were not influential or the information not important. *Id.* at 6, 58 S.Ct. at 471.

In more recent decisions, courts rejected arguments that nonreliance was a defense and held that, to violate § 1014, the defendant merely had to make statements having "the capacity to influence" the institution. *United States v. Goberman, supra; United States v. Braverman*, 522 F.2d 218 (7th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975). Contrary to Johnson's assertions, this language does not excuse a defendant whose false statements are made to co-conspiring insiders and thus have no "capacity to influence." Rather, the rule focuses on the materiality of the false statement. *Id.* at 223. Thus, if a defendant knowingly makes a false statement to an institution which is material "to influencing in any way" that institution, then the specific intent necessary to violate § 1014 may be inferred and the offense is complete.

*United States v. Baity, supra*, and *United States v. Braverman, supra*, support this court's refusal to recognize the so-called "complicity" defense. The convictions in both decisions stood even though an insider participated in the fraud and the government did not prove that the institution actually relied on the false statements. The defendant in *Baity*, acting in concert with a bank vice president, pledged valueless corporate assets to obtain a loan. After the vice president made the loan, the two collaborated on a false financial statement which the vice president placed in the appropriate bank file. Even though the defendant did not submit the financial statement until after he received the loan and even though he conspired with an insider to perpetrate the fraud, the court sustained the implicit jury finding that he had the required intent to influence the bank. Similarly in *Braverman*, the defendant participated in a conspiracy in which he used a false name to obtain a loan for an insolvent friend. The facts that a bank officer was also active in the conspiracy and that he granted the loan before the defendant made the false statement were irrelevant. The court stated "the words, 'for the purpose of influencing' were included in the statute to define the quality of the required

---

traveled, in our search for the meaning of the lawmakers, beyond the borders of the statute." *United States v. Great Northern Ry.*, 287 U.S.

144, 154, 53 S.Ct. 28, 32, 77 L.Ed. 223 (Cardozo, J.), but have returned to its four corners.

intent, not to immunize a party from criminal liability because an officer of the bank was involved in the fraudulent scheme." 552 F.2d at 223, quoting *United States v. Niro*, 338 F.2d 439, 441 (2nd Cir. 1964).

Johnson argues that these and similar cases are limited to situations in which, despite some insider participation, not all bank officials who approve the transaction know of the conspiracy. Relying on dicta in other cases, he claims that if all personnel who must consummate a transaction are aware of its fraudulent nature, then the defendant who makes the false statements has not violated the statute. *See United States v. Fairbanks*, 541 F.2d 862, 864 (10th Cir.), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 532, 50 L.Ed.2d 613 (1976); *United States v. Niro, supra* at 441. Johnson erroneously expands the *ratio decidendi* of these opinions. Their observations go no further than to focus on a particular defendant's intent. This court and the Second Circuit did note that even though an insider participated in the scheme, other bank officers and agents who approved the transaction had no knowledge of the fraud. Neither court held, however, that if all persons necessary to approval are involved in the scheme, then § 1014 could not have been violated; nor did either court interpret "influence" to require that the institution be actually deceived. The word has no inherent non volitional meaning and we are not bound to read it other than plainly.

## Intent

Johnson next argues that even if the excluded evidence was not admissible to

show complicity, it was nonetheless relevant on the issue of his intent. The evidence excluded was claimed to be an elaborate web of circumstantial proof demonstrating that Surety knew the notes were bogus and that it encouraged the fraud as a means of balancing its books. Such evidence would not have refuted the government's case that Johnson illegally intended to influence the institution. If believed, it would only have demonstrated that instead of trying to trick Surety, Johnson was cooperating with it in a conspiracy involving the use of false documents. In either case, the influence the defendant sought to exert was illegal.

▮▮▮ Even if the evidence were relevant to Johnson's claim of no intent, the trial court did not err in excluding it. The exclusion is justifiable on the basis that the mass of detail to be explored was so confusing as to outweigh any favorable inference Johnson might have squeezed from it. On such a matter of legal relevance the trial judge has wide discretion. *See* 401 Fed.R. of Evid. Unless a defendant can demonstrate abuse of that discretion, an appellate court will not reverse.[4] *Wright v. Hartford Accident & Indemnity Co.*, 580 F.2d 809 (5th Cir. 1978). Johnson here has made no such showing.

## Limitation of Cross-Examination

▮▮▮ Johnson urges that the trial court, in prohibiting cross-examination of certain witnesses, erroneously prevented him from attacking their credibility by establishing

4. Discretion as used here does not mean that a trial court may choose among alternatives. Strictly speaking, there is only one "correct" choice. It means instead that for two reasons an appellate court ought not quickly substitute its judgment. First, the trial judge is in a superior position to weigh the true potency of the proffered evidence. Second, because that decision is made in the rapid fire tempo of trial, it ought not be judged too harshly with the advantage of hindsight, printed briefs, and a fully developed record. The first is bottomed on an effort to obtain the most correct appraisal. The second is an institutional consideration that compels a recognition that no trial is perfect. It is the weaker because it comes freight-

ed with the circumstance that in a time of crushing dockets, a trial court decision may not be subjected to the discipline of articulated justification but may be simply stamped as approved or disapproved. This type of "discretion" is to be distinguished from a variety of decisions made daily by trial judges that are ultimately arbitrary in the sense that their basis is not subject to nonsophistical explanation. They have been called black box decisions. *See* Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex.L.Rev. 47 (1977). The only appellate review involved in this third category is the categorization of claimed error as "discretionary."

their bias, motives, and interest. The opportunity to wield the adversary sword of cross-examination and test the weight and credibility of a witness' testimony is fundamental to fair trial. *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). Cross-examination, although venerable, must still be exercised within the limit of relevance. Here in curtailing cross-examination, the trial court repeatedly advised defense counsel that he was inquiring into irrelevant matters. No demonstration of relevance came in response. Nor does the record by the context of the questioning reveal relevance.

■ The trial court sustained objections to the cross-examination of former C. J. Limited salesman Jesse F. Horner concerning his involvement in a land syndication known as South Padre Island, Ltd. Johnson contends that this ruling prevented him from showing that the witness' motive in giving damaging testimony against him was fear of prosecution for the South Padre activity. Evidence that Horner's involvement in other criminal transactions prompted his guilty plea would have been probative of his credibility. Defense counsel failed to make an adequate showing at trial, however, that the prior land syndication was actually connected to Horner's plea. Neither in his questioning of Horner before the court sustained the prosecution's objection nor in his proffer did counsel indicate that the activities surrounding South Padre Island, Ltd. had been the subject of an investigation or that an investigation had been planned or threatened. Apart from the failure to preserve any error, *see* Rule 103 Fed.R. of Evid., it is apparent that if the trial court had adopted Johnson's theory of relevance and had allowed defense counsel to proceed, this trial would have been put to one side while the court proceeded to try the South Padre Island syndication in order to ascertain whether it did indeed involve criminal conduct. Such a potentially prolonged inquiry into this collateral matter with only a hope of straining out the tenuous inference that the authorities had knowledge of the transaction and, even more attenuated, that the witness' testimony was shaded for fear of prosecution, could only have served to confuse the jury. A lay person freed of the disabilities of legal training would have simply labeled the pleaded-for side trip as far fetched; so do we. The trial court properly excluded it.

■ Although Johnson made no such contention at trial, he now argues that Horner's South Padre Island, Ltd. testimony was also relevant to establish the witness' knowledge and intent regarding the C. J. Limited nominee purchaser transactions. Rule 404(b) Fed.R. of Evid. allows the introduction of evidence of other crimes, wrongs, or acts to prove intent or knowledge if, in view of the other available means of proof, its probative value outweighs its prejudicial effect. This rule usually finds its application in prosecution efforts to introduce against the accused evidence of acts not charged in the indictment. Johnson failed to make clear to the trial court or this court how Horner's testimony was relevant to his case. The proffered evidence is claimed to support an inference that in the C. J. Limited transaction, the witness had the same intention as he did in the South Padre Island, Ltd. activities. Yet as a cooperating government witness, Horner was admitting his *mens rea;* and considering that Horner was indicted for conspiracy with Johnson to violate § 1014, such testimony could only have been detrimental to Johnson. The evidence was not relevant to his defense and he has no grounds to complain.

■ Johnson claims that the trial court erred in forbidding cross-examination of Horner concerning his claim of the Fifth Amendment when he was asked before the grand jury whether he knew that Larry Parker had acquired Surety. Johnson argues that this claim of privilege is relevant because it conflicts with the witness' trial testimony denying knowledge that Parker purchased Surety. The argument is factually flawed at the outset. Johnson admitted knowledge. His prior invocation of the Fifth Amendment privilege thus was not inconsistent with his later trial testimony. *See United States v. Hale,* 422 U.S. 171,

176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). The only remaining purpose for which defense counsel might have sought to introduce Horner's past silence would have been to encourage the jury to infer that the witness had something to hide. Because a plea of privilege in such circumstances is not probative of guilt, the court properly excluded the evidence. *See Rubin v. United States,* 559 F.2d 975 (5th Cir. 1977), *vacated on other grounds,* —— U.S. ——, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978). A claim of privilege before a grand jury is wholly consistent with innocence. The Supreme Court has stated:

> Innocent men are more likely to plead the privilege in secret proceedings, where they testify without advice of counsel and without opportunity for cross-examination, than in open court proceedings. *Grunewald v. United States, supra,* 353 U.S. at 422–23, 77 S.Ct. at 983.

### Other Exclusions of Evidence

■■■■ Johnson argues that he should have been permitted to demonstrate that Donald Eckardt, Surety's attorney, and David Lavene, Surety's treasurer, were accomplices of the accused. The record does not reflect a single defense proffer to the effect that the excluded cross-examination was relevant either to establish Eckardt and Lavene as accomplices or to demonstrate their bias or interest. If a defendant's wishes are not readily discernible from context, then unless he makes known to the trial court the action which he desires it to take or his objection to the action taken and the grounds therefor, an appellate court generally will not review the trial court's rulings absent plain error. *Wright v. Hartford Accident & Indemnity Co., supra.* Plain error is an elusive concept, sometime more plainly stated than plainly perceived. There are few hard and fast classifications either in the application of the principle or in the use of the descriptive title. *See United States v. Fairchild,* 505 F.2d 1378, 1384 (5th Cir. 1975). The vagueness of its standard is not a product of imprecision in statement and analysis, but is inherent in its function. It is a residuum of power which, withheld from the trial participants' usual control over preservation of error, protects not only their immediate interests but also the criminal justice process itself. Thus its definition is less what it is and more what it is not. The litany goes that where the mistake is "obvious and substantial," *Sykes v. United States,* 373 F.2d 607, 612 (5th Cir. 1966), where it is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done," then it constitutes plain error. *United States v. Summerour,* 279 F.Supp. 407, 410 (E.D.Mich. 1968). *See United States v. Garber,* 471 F.2d 212 (5th Cir. 1972). Johnson had ample opportunity to cross-examine witnesses Eckhardt and Lavene on other matters. The limited and unclear proffers leave the record in a posture such that one can only conclude that the excluded cross-examination would have been more confusing than probative. If error, it is not plain.

### Variance

Johnson next argues that a variance exists between the indictment and the proof. The indictment charged two counts of conspiracy, the first based on the "first closing" in which C. J. Limited sold Surety 25 real estate packages, and the second based on the "second closing" which occurred seven weeks later and involved the additional sale of four real estate packages. Johnson argues that if the evidence established anything, it proved that the two sales were a part of the same conspiracy. He contends that this discrepancy entitles him to a judgment of acquittal on the second count.

The question of whether a variance exists arises most often in circumstances that are exactly the opposite of those in Johnson's case. Generally, the defendant, convicted of a single conspiracy, contends that the evidence proves multiple conspiracies. *See, e. g., United States v. Perez,* 489 F.2d 51 (5th Cir. 1973); *United States v. Cruz,* 478 F.2d 408 (5th Cir. 1973); *United States v. Morado,* 454 F.2d 167 (5th Cir. 1972). The issue which Johnson presents is actually less

one of variance than of the sufficiency of the evidence to support the jury's finding that beyond a reasonable doubt there were two conspiracies. *See United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969).

 The focus of this inquiry is on whether reasonable minds could differ in deciding how many goals the various participants pursued. This and other circuits have held that, despite proof of multiple actions, if the totality of the evidence shows a concert of action in which all parties worked together with a single design for the accomplishment of a common purpose, then there is but one conspiracy. *United States v. Perez, supra; United States v. Varelli, supra.* If, however, the evidence reveals beyond a reasonable doubt two separate agreements, each having its own distinct illegal end, then the jury properly convicted Johnson of two conspiracies. Mere similarity of aim is not enough to defeat a two-conspiracy theory. Rather, if neither conspiracy depends on, is aided by, or has an interest in the success of the other, then despite like goals or identical parties, two conspiracies may nonetheless exist. *United States v. Morado, supra; United States v. Varelli, supra.*

The evidence in Johnson's trial was sufficient for the jury to conclude beyond a reasonable doubt that there were two conspiracies. The testimony of the C. J. Limited officers and employees concerning the original agreement indicated that it encompassed only 25 notes and that it was to be closed July 30, 1975. The parties did not contemplate a second sale until after this first transaction was successfully completed. Parker then approached Surety and became the broker for the second closing. At the time of the first closing, the first notes that were later transferred were not in existence.

### Obstruction of Justice

Johnson raises two grounds for reversal of Count III, the obstruction of justice charge: First, insufficient evidence that the witness testified before a federal rather than a state grand jury; and second, improper jury instructions. We reject both arguments.

 The record presents sufficient circumstantial evidence to prove beyond a reasonable doubt that the witness Boettcher, whom the defendant is alleged to have improperly influenced, was to be a witness before a federal grand jury within the scope of 18 U.S.C. § 1503. Ms. Boettcher testified that she was subpoenaed before a grand jury "in this building." The jury certainly knew the witness was referring to the building where the trial was held, the federal courthouse in Houston, Texas. In the record there are also references to a grand jury inquiry following an investigation by the Federal Bureau of Investigation, and to a federal offense.

 Johnson further contends that the trial court did not properly instruct the jury on the *mens rea* necessary to violate 18 U.S.C. § 1503. A specific intent to impede the administration of justice is an essential element of this offense. *United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1972); *Knight v. United States*, 310 F.2d 305, 307 (5th Cir. 1962). Johnson claims that under the district court's definition, proof of any act to influence a witness under any circumstances and for any purpose would automatically subject the accused to criminal penalties, regardless of his intent. Johnson's argument is correct in stating that isolated sentences of the charge could be construed to render obstruction of justice a strict liability offense. When viewed as a whole, however, the court's instructions cannot fairly be said to have misled the jury in the proper application of the law, or to have permitted the jury to convict the defendant in the absence of *mens rea*. The court instructed the jurors that to return a verdict of guilty they must find beyond a reasonable doubt that the defendant had the specific intent to do an act the law forbids, that is, to corruptly endeavor to influence or impede the witness in the discharge of her duty. The use of the word "corrupt" pervaded the charge. A reasonable jury exercising common sense could not

have been deceived into thinking that a good faith effort to obtain the presence of a reluctant witness or to urge truthful testimony is contemplated within the meaning of "corruptly endeavors."[5] *See United States v. Cioffi*, 493 F.2d 1111, 1119 (2nd Cir. 1974).

For these reasons we AFFIRM the judgment of conviction.

---

**5.** Hon. David L. Bazelon wrote in *The Vision of Leon Green*, 56 Tex.L.Rev. 439 (1978), "It can be said roughly that the concept of prejudice requires us to measure legal error by its impact on a jury's perceptions." *Id.* at 443, n.14. Judge Bazelon was commenting on the following statement made by Dean Leon Green: " . . . It is one thing to state the law in terms of exact major premises, crystal formulas, in a tediously considered formal document. It is an entirely different thing to get a determination of a state of facts, dull or dramatic, after they have been buried beneath the fancies, suspicions, irrelevancies, arguments, boring details of a court room. It would be just as intelligent to drill the delicate points of wood carving into a broad axe-man as it is to instruct a jury in the nice discrimination of legal terms." Green, *A New Development in Jury Trial*, A.B.A.J. 715, 718 (1927).