**EXCEL HANDBAG CO., INC., etc., Plaintiff-Appellant, Cross-Appellee,**

v.

**EDISON BROTHERS STORES, INC., etc., Defendant-Appellee, Cross-Appellant.**

**No. 78–1326.**

United States Court of Appeals, Fifth Circuit.

Nov. 14, 1980.

Joe N. Unger, Miami, Fla., for plaintiff–appellant, cross–appellee.

Calvin F. David, N. James Turner, Miami, Fla., for defendant–appellee, cross–appellant.

Before RONEY, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

In an action for breach of contract, arising out of appellee's alleged failure to pay for certain goods, appellant received a jury award of $110,810.56, as compensatory damages. Appellant appeals the trial court's directed verdict for appellee on the question of punitive damages. Appellee cross–appeals with respect to the trial court's statements of law on commercial bribery as a defense in contract actions and on the waiver of that defense. Appellee also asserts error in the trial court's dismissal of the third–party defendant and the directed verdict against its antitrust counterclaim. We reverse and remand on the issue of punitive damages, reverse the failure to grant appellant's motion for a directed verdict on appellee's commercial bribery defense, and affirm the judgment in all other respects.

THE FACTS

Plaintiff–appellant, Excel Handbag Co., Inc. (Excel), manufactures women's handbags. Defendant–appellee, Edison Brothers Stores, Inc. (Edison), purchases handbags from Excel, as well as other manufacturers, and resells them through its chain of retail stores.[1] Excel and Edison enjoyed harmonious business relations for twenty–five years, until this litigation arose.

The central character in this story is Joseph Fingerhut (Fingerhut), a former employee of Edison. Fingerhut was responsible, with one other individual, for purchasing all of Edison's handbag requirements. He was accountable for his purchases only to Bert Talcoff, an Edison vice–president and the director of Edison's merchandise division.

In the spring of 1976, Edison undertook an investigation into certain allegations that Fingerhut had accepted bribes from some or all of the vendors from whom he purchased handbags. The investigation was conducted primarily by Herbert Robinson (Robinson), an attorney having considerable expertise in such matters. The investigation resulted in an indication that many of the manufacturers from whom Edison purchased goods were paying Fingerhut kickbacks, based on either a percentage of the total sale or a fixed price per dozen handbags. The only evidence uncovered with respect to Excel was (1) that its president, Marvin Fink (Fink), who allegedly was known as a "kickback artist," had

1. Edison owns and operates approximately 1,300 retail outlets nationwide. Its stores sell shoes, handbags, and hosiery. Its recent annual gross sales were in excess of $50,000,000.

thrown a number of $100 bills into the air during a meeting with an unknown party and said, "I'm going to St. Louis," [2] and (2) that Fingerhut allegedly admitted receiving five–hundred dollars from Fink "occasionally" "around Christmastime."

The alleged statement that Fink gave Fingerhut five–hundred dollars occasionally around Christmastime came at a meeting between Fingerhut, Robinson, and Julian Edison on May 10, 1976.[3] At that time, Excel was in the process of filling an order for Edison having a total sales price of approximately $110,000.[4] Excel also had shipped $43,831.50 worth of goods to Edison's warehouse, where it was kept in storage.[5]

Upon discovery of what it thought to be widespread bribery between Fingerhut and a number of its suppliers, Edison took the position that it would not continue doing business with any of them until they had cleared themselves of all allegations.[6] In

Excel's case, this meant that Edison would place no more orders and would not pay for the Count I goods, until Excel cleared itself. As the existence of this action indicates, Excel was unable to clear itself to Edison's satisfaction. Fink had a number of conversations with Robinson and other Edison officials involved in the investigation, in which he denied that he or his company ever gave bribes, money, or gifts to any Edison employee. He offered to sign an affidavit so stating. Fink was not willing, however, to comply with Robinson's request that he submit to a polygraph examination. Robinson, in turn, refused to give Excel clearance until Fink would agree to take the test.

The facts surrounding the Count III goods are quite different.[7] They were ordered on May 7, 1976, and were to be invoiced on July 5, 1976. Sometime around July 5, 1976,[8] Robinson called Bernard Mandler (Mandler), counsel for Excel, and indi-

---

2. No one from Edison was present at that meeting. Appellee concluded that this was evidence of pay–offs by Excel because St. Louis was the location of Edison's office and Fingerhut was the only Edison employee who purchased from Fink. As will be discussed, *infra*, this Court has a great deal of difficulty making an inference of wrongdoing from such an ambiguous comment.

3. Fingerhut was fired during this meeting because, according to Julian Edison, they did not believe he was being honest about the extent of the kickbacks he received.

4. These are the goods on which Count I of Excel's complaint is based (Count I goods).

5. These are the goods on which Count III of Excel's complaint, for conversion, is based (Count III goods). By contract the parties had agreed that Edison would store the goods in its warehouse, but that Excel would retain title to the goods until Edison received an invoice. Under normal circumstances, the invoice was received on the date Edison wanted to take possession of the goods. Payment for the goods was due thirty days after receiving the invoice. This procedure was employed primarily for accounting purposes.

As will be discussed, *infra*, it was Edison's failure to adhere to this procedure that gave rise to Excel's claim for punitive damages.

6. Julian Edison, Edison's president, testified that, pursuant to company policy,

With regard to the vendors, we determined that the thing to do was–on any vendor that we had any evidence or suspicions that they were paying off our buyers, we stopped doing business with them immediately and gave those instructions to Mr. Talcoff and our buying staff.

In addition, we required any of our vendors subsequently who we had those suspicions or evidence–we required them to clear themselves with the company before we would do any further business with them.

Record on Appeal, Vol. VIII, p. 1206.

7. On appeal, Edison does not contend that it was error to grant Excel's motion for a directed verdict with respect to the Count III claim for conversion. The Count III goods bear on this appeal only to the extent Excel contends that Edison's conduct with respect thereto indicates willful and wanton acts sufficient to sustain their claim for punitive damages. Therefore, the only facts pertaining to the Count III goods included herein are those going to the question of punitive damages.

8. There is conflicting testimony as to when this conversation took place. Robinson testified that it was prior to July 5, 1976. Mandler testified that it was subsequent to that date. Though the resolution of that discrepancy may have some significance when the issue of punitive damages is retried, it does not affect our resolution of this action.

cated Edison's intention to take legal possession of the Count III goods on the date that they originally were to have been invoiced. Mandler responded that Excel would not relinquish title to those goods unless Edison agreed to pay for the Count I goods as well as the Count III goods. Robinson testified that he responded, "I told Mandler that Edison would pay for the goods...."[9] Robinson then called Eric Newman (Newman), an executive vice–president and the secretary of Edison, and explained Excel's position that the Count III goods were not to be taken down [10] until the Count I goods were paid for. Robinson advised Newman to pay for the Count III goods, and Newman agreed. The Count I goods were not paid for, and Excel did not relinquish title to the Count III goods by invoicing them. Nonetheless, on July 6, 1976 the Count III goods were taken down by Edison. The next day, Robinson called Mandler to inform him that the Count III goods had been taken down and that Edison intended to pay for them. Payment was not forthcoming, however, and when Robinson received a copy of the complaint in this case, on July 28, 1976, he telephoned Newman and told him payment needed to be made.[11] Newman telephoned Miller Walton (Walton), Edison's attorney in Florida, and informed him that Edison was forwarding a check to him in an amount equal that due Excel for the Count III goods. Newman further testified that he instructed Walton to tender the check to Excel. Walton received the check, dated August 17, 1967, some three weeks after that conversation.

Walton tendered the check to Mandler, on the condition that payment would not be made unless Excel agreed to dismiss its claim for punitive damages in the present action.[12] Mandler rejected the tender so conditioned. As of the time of trial, in September of 1977, none of the goods had been paid for.

PUNITIVE DAMAGES

Excel's only contention on appeal is that the trial court erred in granting Edison's motion for a directed verdict on Excel's claim for punitive damages. Excel asserts that sufficient evidence was introduced to create a question of fact for the jury concerning the willful, wanton, and malicious character of Edison's conduct with respect to the Count III goods. For the reasons indicated below, we agree that the issue was one for the jury.

The initial issue is whether a federal District Judge deciding if there is sufficient evidence to create a jury question should use the sufficiency of evidence test of the state in which the court is located or the federal test. We start with the proposition that in diversity actions, such as this, federal courts are required to apply the substantive law of the jurisdiction in which the district court hearing the case is located. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This Court uniformly has held, however, that the federal rather than the state test should be applied to determine if there is sufficient evidence to create a jury question because the issue is one of procedural rather than

9. It is unclear from this statement, and it is disputed between the parties, whether Robinson's reference to "the goods" included both the Count I and the Count III goods or just the Count III goods.

10. "Taken down" is an expression meaning that title to the goods shifts from the vendor to the vendee, and the vendee is moving them from inventory into its chain of distribution.

11. Newman explained at that time, as Edison has continued to assert, that payment was not made because, pursuant to the contract between the parties, payment was not due. Under that contract, Edison was required to make payment within thirty days of receiving an invoice for the goods. As we indicated earlier,

however, Excel did not invoice the Count III goods because it did not want Edison to take title without paying for the Count I goods.

12. Edison denies that such a condition was attached to its tender. For the purpose of deciding whether the trial court erred in directing a verdict against Excel on its punitive damages claim, we must view the evidence in a light most favorable to Excel. Because there was some evidence that such a condition existed, we assume it to be a fact for the limited purpose hereof. It, of course, will be up to the jury to decide that fact conclusively when the issue is retried.

**384**

substantive law. *Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 738 (5th Cir. 1980) (en banc).

■ The test in this Circuit for deciding the appropriateness of a directed verdict is that it should not be granted if a reasonably minded jury could arrive at a verdict other than that sought by the party requesting the directed verdict. *Id.; Cora Pub, Inc. v. Continental Gas Co.*, 619 F.2d 482, 484 (5th Cir. 1980). In making that determination, the evidence must be considered as a whole and viewed in a light most favorable to the party opposing the directed verdict. *Id.* A directed verdict is not limited to those situations in which there is a complete absence of probative facts to support a jury verdict. It is also warranted when there is no conflict in substantial evidence. *Broad v. Rockwell International Corp.*, 614 F.2d 418, 425 (5th Cir. 1980). Applying this standard to the present action, the trial court concluded that Excel had failed to establish sufficient evidence of willful, wanton, or malicious conduct to create a jury question as to punitive damages, and, accordingly, directed a verdict for Edison on that count.

■ Our first step in reviewing the trial court's conclusion [13] is to determine what is required under Florida law to justify the award of punitive damages. Recent decisions of the Florida Supreme Court and other Florida courts clearly state that punitive damages are not to be awarded in an action for breach of contract unless the breach also constitutes an independent tort. *Butchikas v. Travelers Indem. Co.*, 343 So.2d 816, 817 n. 2 (Fla.1977); *American International Land Corp. v. Hanna*, 323 So.2d 567, 569 (Fla.1976); *Griffith v. Shamrock Village*, 94 So.2d 854, 858 (Fla.1957). An independent tort must be specifically pled. *Roger Lee, Inc. v. Trend Mills, Inc.*, 410 F.2d 928, 929 (5th Cir. 1969). Moreover, the party seeking punitive damages must

establish that the tort was committed willfully, wantonly, maliciously, or with conscious disregard for the legal rights of the injured party. *American International Land Corp., supra; Griffith, supra.*

■ There is no doubt that an independent tort was both pled and established in the present action. The trial court directed a verdict for Excel on its Count III for conversion, and Edison does not appeal that ruling. The next question is whether there was sufficient evidence from which a reasonably minded jury possibly could conclude that Edison's conduct was willful, wanton, malicious, or in conscious disregard of Excel's legal rights. We hold that there was sufficient evidence from which a jury could so conclude. [14]

Recent decisions of this Court interpreting Florida law, as well as decisions of various state courts of Florida, have held that the essential elements of willful and wanton misconduct are "(1) the actor must have knowledge, actual or constructive, of the likelihood that his conduct will cause injury to other persons or property; and (2) the conduct must indicate a *reckless indifference* to the rights of others, that is, conduct which may be termed equivalent to an *intentional violation* of those rights." *Boyce v. Pi Kappa Alpha Holding Corp.*, 476 F.2d 447, 452 (5th Cir. 1978); *Glaab v. Caudill*, 236 So.2d 180, 184 n. 13 (Fla.D.C.A. 2, 1970).

In *Jonat Properties v. Gateman*, 226 So.2d 703 (Fla.D.C.A. 3), *cert. denied*, 234 So.2d 123 (Fla.1969) the Florida Court of Appeals was called upon to decide whether the trial court erred in allowing the question of punitive damages to go to the jury. In that case, appellee received in a divorce settlement her husband's one–half interest in a promissory note executed by appellant. Prior to its maturity, appellant executed an agreement with the holder of the other

---

**13.** In reviewing the ruling of the trial judge, we are not limited to a clearly erroneous standard because the court's conclusion was one of law, not one of fact. *Western Beef, Inc. v. Compton Investment Co.*, 611 F.2d 587, 590 (5th Cir. 1980).

**14.** We, of course, do not suggest the weight that the jury will give this evidence when the issue of punitive damages is retried.

one–half interest extending the maturity date of the note. This was done without the knowledge of the appellee. Appellant refused to make payment on the note on the date it was originally to come due, asserting the written extension as a defense. Appellee brought an action for tortious interference with her contract rights. The court held that appellant's failure to make payment when due was sufficient evidence of willful and wanton conduct to properly raise a jury question as to punitive damages.[15]

The present action is similar to *Jonat Properties, Inc. supra*, to the extent that both required the court to consider whether tortious acts involving failure to pay a debt owed could be evidence of willful and wanton conduct. We conclude that Edison's course of conduct with regard to the Count III goods, that is taking them down after being told they could do so only if they intended to pay for all the goods and then failing to pay for any goods during the fifteen month period it took for this case to come to trial, could be construed as willful and wanton. Though the trial court was correct that this evidence could be construed as indicating good faith efforts between counsel to resolve the conflict, it could also be interpreted as a conscious decision by Edison to wrongfully take the goods and to withhold payment therefor for the purpose of forcing Excel to relinquish some of its legal rights. We, of course, do not suggest which of these possible interpretations is more plausible. That is a question for a jury to decide. Accordingly, the case must be remanded for a retrial on the issue of punitive damages.

## COMMERCIAL BRIBERY

Edison contends that the trial court erred by instructing the jury (1) that to establish the defense of commercial bribery the party asserting the defense must prove that the bribe was the "inducing cause" for placing the orders for which payment is withheld

and (2) that the defense of commercial bribery can be waived if the party asserting the defense continues to receive goods after becoming aware of the bribe. Because we conclude that, as a matter of law, the evidence was insufficient to establish commercial bribery under any definition, we do not reach Edison's second contention.

Our resolution of the commercial bribery defense is controlled by Florida law. *Erie, supra*. Unfortunately, however, Florida law on the question of commercial bribery is far less clear than it was with respect to punitive damages. It is our responsibility, therefore, to construe the existing decisions in a manner which we believe is consistent with the treatment they would receive were the Florida Supreme Court called on to make this decision.

■ Initially, we think it necessary to distinguish commercial bribery, as a defense to payment of a debt, from an action to recover secret payments or kickbacks, as an affirmative claim or counterclaim. As to the latter, the law of Florida is quite clear. When an agent receives money, gifts, or other compensation from one doing business with the principal, and the payment, unknown to the principal, arises out of the employment relationship, the principal has an equitable action against the agent and the third–party payor to recover those "secret profits." *ITT Community Development Corp. v. Barton*, 457 F.Supp. 224, 230 (M.D.Fla.1978); *Martin Co. v. Commercial Chemists, Inc.*, 213 So.2d 477 (Fla.D.C.A. 4, 1968), *cert. denied*, 225 So.2d 523 (Fla.1969). The rationale for such a rule is quite sound. An agent has a fiduciary duty to exercise his best judgment in the interest of the principal. An agent cannot meet this responsibility if his loyalties are divided; as they undoubtedly must be when an agent accepts compensation from one who has an ongoing business relationship with the principal. In the present action, Edison did counterclaim to recoup the alleged secret

---

**15.** The Florida court was using its own sufficiency of evidence test rather than the federal test. Though there is some difference in the quantum of evidence required under each stan-

dard, we do not believe the difference is significant for the purposes of the question discussed herein.

profits. The trial judge correctly instructed the jury that Edison was entitled to recover if it proved that a bribe was paid. The jury rendered a verdict against Edison on this counterclaim, and Edison has not appealed that part of the judgment.

■ The more difficult question is whether Florida law recognizes commercial bribery as a defense to payment for goods received and, assuming that it does, whether evidence of commercial bribery was produced in this case. The parties have not cited any Florida cases, nor has our independent research discovered any Florida cases, in which commercial bribery was specifically recognized as a defense to payment for goods received. Florida has not statutorily recognized such a defense. Florida has recognized fraud, both by statute and as a matter of common law. While we are reluctant to say how the Florida Supreme Court would resolve the question, we believe the public policy of that state regarding fraud in general suggests that commercial bribery would be recognized as a defense. We also believe that the Florida courts would define the elements of commercial bribery in the same manner as the district court did in this case, i. e., secret payments to an agent inducing the purchase of goods for the principal from the party making those payments.[16] This interpretation seems particularly reasonable when one considers the fact that Florida currently recognizes a principal's right to recoup secret payments simply by proving the fact of those payments. A review of Florida cases involving claims for goods sold reflects many instances of counter-claims for recoupment of "bribes" but a striking absence of the defense of "commercial bribery." Given this absence of the commercial bribery defense in those cases in which principals have sought to recoup secret payments, it is unreasonable to assume that such defense was available to those litigants simply by offering the same proof that was offered to recoup the payments.

■ Having concluded that the defense of commercial bribery requires some proof of inducement, we could decide that the trial court correctly instructed the jury, and then turn our attention to the question of waiver. We hold, however, that the evidence presented at trial was insufficient to raise the issue of commercial bribery, as a matter of law. In addition to a bribe, the defense of commercial bribery requires some evidence of a causal relationship between the giving of the bribe and the purchasing of goods by the bribed agent. It seems clear to us, for example, that a bribe resulting in the diminution of business with the bribing party, that is an ineffective bribe, could not give rise to a claim of commercial bribery. On the other hand, such a bribe would justify an equitable action by the principal against his agent and the bribing party to recover the amount of the bribe. In the present action, there was no evidence from which a reasonable jury could draw the inference that the alleged bribe bore any relation to the purchase of the goods in question. There was no evidence as to when Fingerhut allegedly received the five–hundred dollars from Fink, except that it was around Christmastime. That could refer to any one of the twenty–five Christmas holidays during which Excel sold goods to Edison through Fingerhut. Nor was there any evidence that Fingerhut's orders from Excel were larger during those Christmas holidays during which the alleged bribe was paid than they were dur-

16. Though Florida has not specifically recognized or defined commercial bribery, its statutory and case law involving contracts entered into by fraud is quite analogous to the situation presented here and is, therefore, indicative of the manner in which the Florida courts would resolve this issue. In a number of cases brought by purchasers to rescind a contract on the grounds that it was procured by fraud, the courts of Florida have required proof that the fraud was an inducing and material factor in the decision to enter into the contract. *See, e. g., Storrs v. Storrs*, 130 Fla. 711, 178 So. 841, 842–43 (1937); *Nantell v. Lim–Wick Const. Co.*, 228 So.2d 634, 637 (Fla.D.C.A. 4, 1970); *Gammage v. Turner*, 206 So.2d 252, 255 (Fla.D.C.A. 2, 1968), *cert. denied*, 212 So.2d 870 (Fla. 1968). These decisions lead us to agree with the trial court's conclusion that in an action for fraud the courts of Florida would require evidence that the fraudulent act induced the formation of the contract.

ing those years that a bribe was not paid. This Court is equally unable to draw any inference of wrongdoing from Fink's commenting, "I'm going to St. Louis", at the time he threw several $100 bills in the air. Since we believe Edison failed to offer sufficient evidence on which to base its commercial bribery defense, we hold that the trial court erred in denying Excel's motion for a directed verdict as to that defense.[17] Because the jury's verdict is consistent with our ruling, however, any error in this matter by the trial court was harmless.

Even if we concluded that Edison produced sufficient evidence to raise a jury question concerning commercial bribery, our resolution of this case would be the same.[18] The jury rejected Edison's counterclaim for an equitable accounting of the amount of the bribe allegedly paid to Fingerhut. As indicated earlier, Edison would have been entitled to recover on its counterclaim without proof that the alleged bribe induced anything. The jury need only have concluded that a bribe occurred. Apparently, it did not. Since we may infer from the verdict the fact that the jury did not believe there was a bribe, it is a *fortiori* correct that commercial bribery could not exist.[19] Had the jury returned a verdict for Edison on Excel's Count I, without also awarding Edison the amount of the bribe, the trial court would have been required to enter a judgment notwithstanding the verdict for Excel or ordered a new trial.

## THE ANTITRUST COUNTERCLAIM

■ Edison founded its counterclaim for violating Section 2 of the Robinson–Patman Act on the existence of commercial bribery. Since we have concluded that there was insufficient evidence to sustain the commercial bribery defense, the antitrust claim must also fail.

If we assumed that commercial bribery alone could constitute a violation of Section 2 of Robinson–Patman, a conclusion we specifically do not reach, we might be required to hold that the district court erred in directing a verdict against the antitrust counterclaim. This would be so because it could

**17.** Though the trial judge ultimately allowed the jury to consider the commercial bribery defense, he expressed serious concern throughout the trial with the sparsity of evidence that Edison offered in support of that defense. He also indicated that he might enter a judgment notwithstanding the verdict for Excel, should the jury find for Edison on the basis of the commercial bribery defense. Indicative of the doubt which the trial judge entertained with respect to the commercial bribery defense, is the following comment by the judge at sidebar:

> On the question of whether or not there is a proximate relationship between any so-called payment, whenever they may have been, at Christmastime or otherwise, and the particular sale in question, I think that also becomes a matter of degree, if we assume in the first instance that there is such a thing as commercial bribery in a circumstance such as this, and I'm not entirely convinced of that, but I am sufficiently convinced of it so that I am going to let it go to the jury and then consider it again on posttrial motions, if it needs to be considered again at that point.

Record on Appeal, vol. X, page 1856–57.

Though we reverse the court's ruling, we believe the trial judge's decision to put the issue before the jury was a conscientious act on his part to follow this Court's general guidance that when the trial court thinks a question such as this is close, it is better to let the jury decide it, subject always to the court's discretion to enter a contrary verdict later. In this case, of course, the trial judge was not required to enter a judgment notwithstanding the verdict because the jury concluded that there was no commercial bribery.

**18.** This would be true even if the district court and this Court erred in defining commercial bribery as requiring the element of inducement.

**19.** Having concluded that commercial bribery was not established as a matter of law, we are not required to decide whether a party seeking to assert that defense has waived it by continuing to accept merchandise from the bribing party, after becoming aware of the existence of the bribe. Nonetheless, we note that there are a great number of Florida decisions in which the courts have held that when a party claiming to have been defrauded continues to transact business with respect to the contract fraudulently induced, that party has waived his right to object to the illegality of the contract, although an action for damages caused by the fraud can be maintained. *See, e. g., Bissett v. Bly–Gem Industries, Inc.,* 533 F.2d 142, 151 (5th Cir. 1976); *Harpold v. Stock,* 65 So.2d 477, 478 (Fla.1953); *Storrs v. Storrs,* 130 Fla. 711, 178 So. 841, 843 (Fla.1937); *Gammage v. Turner,* 206 So.2d 252, 256 (Fla. D.C.A. 2, 1967), *cert. denied,* 212 So.2d 870 (Fla.1968).

have been inconsistent for the jury to have been allowed to consider the commercial bribery defense and not allowed to consider the antitrust counterclaim. Given our resolution of the commercial bribery issue, however, any error by the trial court was harmless.

## EXCLUDING PORTIONS OF DEPOSITIONS

Edison contends that the trial court erred by excluding portions of the Fingerhut deposition. The excluded parts related primarily to Fingerhut's bank records. Edison sought to offer them for the purpose of impeaching Fingerhut's credibility. The trial court ruled that the relevance of the excluded portions was doubtful because Edison could not demonstrate any relationship between the bank records and financial dealings between Fingerhut and Excel. The court also ruled that, assuming those portions of the deposition were relevant, they should be excluded because their potential for unfair prejudice far outweighed their probative value. We conclude that the trial court did not err in this ruling.

 The conduct of a fair trial is vested in the sound discretion of the trial judge, and his rulings will not be reversed in the absence of proof of the abuse of discretion. *United States v. Johnson*, 585 F.2d 119, 125 (5th Cir. 1978); *Wright v. Hartford Accident & Indemnity Co.*, 580 F.2d 809, 810 (5th Cir. 1978). This is true in the case of rulings on the relevancy and materiality of evidence under Rule 403 of the Federal Rules of Evidence.[20] *United States v. Hearod*, 499 F.2d 1003, 1004 (5th Cir. 1974). The trial court's ruling that,

given Edison's inability to link Fingerhut's bank accounts to the subject matter of the litigation, it would be more prejudicial to admit the evidence than its probative value warranted, was not an abuse of discretion.[21] This is particularly true in light of the fact that the trial court admitted over two–hundred pages of Fingerhut's deposition.

## DISMISSAL OF THIRD–PARTY DEFENDANT

Edison assigns error to the dismissal, on grounds of lack of jurisdiction over the person and improper venue, of its third–party complaint against Fingerhut. Our affirmance of the trial court's directed verdict on the antitrust counterclaim and our finding that the evidence was insufficient to support a verdict on the commercial bribery claim makes Edison's contention moot.[22]

## SUMMARY

Though we believe the trial court correctly identified the test in Florida for the imposition of punitive damages, we conclude that there was some evidence from which a reasonable jury could conclude that the elements of the test were established. Accordingly, we must reverse the trial court's ruling in this regard and remand the case for a retrial on the question of punitive damages.

We also have determined that, while the trial court correctly identified the elements of commercial bribery, Edison did not produce sufficient evidence to withstand Excel's motion for a directed verdict. Because the jury award was equal to that which Excel would have received had its directed verdict motion been granted, the court's error was harmless. The judgment is affirmed in all other respects.

20. Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

21. Our reading of Fingerhut's deposition indicates that the trial court clearly was correct in his conclusion that, given the tenuous connection between the bank accounts and the busi-

ness relationship of Fingerhut to Excel, the unfair prejudice of admitting that evidence far outweighed its probative value.

22. It should be noted that, although Edison appealed the dismissal of the third party complaint, there is no evidence in the record that it ever served Fingerhut with notice of the appeal. Basic notions of fair play would preclude our deciding this issue without Fingerhut at least having been afforded the opportunity to submit arguments.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.