**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Columbus Schalah STEPHENS, Jr.,
Defendant-Appellant.**

No. 85–4214.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1985.

Grady F. Tollison, Jr., Oxford, Miss., for defendant-appellant.

Glen H. Davidson, U.S. Atty., Alfred E. Moreton, III, Asst. U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before RUBIN, RANDALL and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Columbus Schalah Stephens, Jr. appeals his conviction on one count of falsifying information on a Farmers' Home Administration (FmHA) loan application, 18 U.S.C. § 1014, and five counts of mail fraud, 18 U.S.C. § 1341. He contends on appeal: (1) the evidence is insufficient to sustain his conviction, (2) testimony was erroneously excluded, (3) the jury charge was incorrect, (4) government summary exhibits were er-

roneously admitted into evidence, and (5) the government varied its proof and argument from the bill of particulars. We reject the defendant's arguments and affirm his convictions.

## I. FACTS

Columbus Schalah Stephens, Jr. is one of two shareholders in CMW Land Company, Inc., a 5,051 acre cattle farm in Choctaw, Montgomery, and Webster Counties in Mississippi. Stephens and Eph Wiygul purchased CMW from Staple Cotton Discount Corporation in December of 1973 for $300,000 in cash, assumption of debt to SCDC, and assumption of a first mortgage to Equitable of Iowa. Stephens handled the finances of CMW, and Wiygul supervised the actual farming operation. CMW lost money and Stephens applied for an "EM" Farmers' Home Administration (FmHA) loan in 1976 primarily for the purpose of refinancing the Staple Cotton indebtedness.[1] A loan for $2,141,000 was approved. $1,381,700 of the loan proceeds was paid to Staple Cotton in exchange for Staple Cotton releasing its second mortgage lien against CMW's assets.[2]

CMW continued to lose money and FmHA approved additional loans in 1977, 1978, and 1979. The 1979 loan is the subject of the indictment. As one of CMW's principal shareholders, Stephens submitted his application to FmHA together with CMW's application. The Stephens and CMW applications both stated that the purpose of the loan was to "provide for operating requirements and debt service of CMW Land Company." FmHA's application form is a one page document printed on both sides. The back side is a financial statement and it is headed in one-eighth inch high capital letters: "FINANCIAL STATEMENT AS OF DATE OF APPLICATION". Stephens' application was dated May 22, 1979. Stephens attached a one page financial statement dated December 31, 1978, to his application. · He stated on his application that he owed no judgments yet there was a $7,608 judgment outstanding against him. His application also omitted mention of a $100,000 debt to the Barnett Bank and a $320,000 debt in relation to the "Chambless property." Both of these loans were taken out after December 31, 1978, and prior to May 22, 1979. On the basis of the applications of Stephens and CMW, FmHA approved a $2,960,920 loan.

CMW maintained two accounts in Mississippi, a general account and an operating account. Stephens maintained another account in Florida in the name of CMW Land Company. The address for this account was the same as his residence in Orlando, Florida. Neither Mr. Herrod, the FmHA agent with whom Stephens dealt, nor Mrs. Olmy, CMW's secretary and bookkeeper, had any knowledge of this CMW Florida account. Virtually all of the FmHA loan funds were deposited to either the CMW Mississippi accounts or the CMW Florida account. The evidence shows that Stephens paid $1,122,786.29 out of the CMW Florida account to himself, his creditors, his corporations, his relatives, and others.[3] None of these debt payments or fund disbursements were authorized by FmHA.

---

1. FmHA "EM" loans are emergency loans available to farmers who have suffered severe production losses and are unable to obtain credit from other sources. 7 C.F.R. § 1945 (1985).

2. On the same day FmHA paid Staple Cotton part of the loan proceeds, CMW executed a ninety day note to Staple Cotton for $934,985.82 which represented the balance of the debt that remained after the FmHA payment. To secure this note, Staple Cotton took position behind FmHA on CMW's assets and a second mortgage on 2,450 acres of Florida real estate. Connecticut General Life Insurance Company had the first mortgage on the bulk of this acreage, 2170 acres.

3. $443,001 was transferred from the Florida account to Stephens' personal account. $42,083.25 was applied to a personal loan of Stephens and his wife. $333,212.06 was used to complete the purchase of the Chambless property. Stephens later mortgaged this property to secure a $200,000 loan to himself as trustee and individually. $3,027 was paid to R.K. Strickland, a timber cruiser, for an appraisal of the Chambless property. The defendant needed the appraisal so he could mortgage the land to obtain the $200,000 personal loan. $181,153.98 was applied as a payment on a $2,200,000 loan S & W Farming, Inc., another one of Stephens' and Wiygul's closely held corporations, owed Connecticut General Life Insurance Company.

None of the debts repaid with these funds were listed with CMW's application as debts for which CMW was seeking funds for "debt services." None of the debts repaid with these funds were listed in the Farm and Home Plan (FHP)[4] debt repayment schedule as debts which were to be repaid from the loan funds, nor were any of these disbursements listed in the FHP operating expenses schedule as expenses which were to paid with loan funds. None of these disbursements were reported in monthly cash flow reports as projected expenses, nor were they reported as actual expenses after they were paid. In short, none of these disbursements were ever discussed with or reported to FmHA orally or otherwise.

On May 17, 1984, a Federal Grand Jury in the Northern District of Mississippi indicted Stephens on the one count of filing a false financial statement to obtain a FmHA loan and the five counts of using the mails to defraud the FmHA. The trial lasted eight days. Stephens was convicted on all counts after jury deliberation of approximately one hour. Stephens was sentenced to concurrent three year terms of imprisonment on Counts 2–6, and a concurrent sentence of one year imprisonment on Count 1. Stephens appeals.

## II. INSUFFICIENCY OF THE EVIDENCE

### A. Mail Fraud

■ Stephens argues that the evidence is insufficient to sustain his conviction on five counts of mail fraud in violation of 18 U.S.C. § 1341 (1982).[5] § 1341 requires a scheme to defraud and the use of the mails for the purpose of executing this scheme. *United States v. Curry,* 681 F.2d 406, 410 (5th Cir.1982). The government must prove that the defendant had the specific intent to commit the fraud. *United States v. Goss,* 650 F.2d 1336, 1341 (5th Cir.1981). Stephens challenges the sufficiency of the proof of his specific intent to defraud FmHA.

In evaluating the sufficiency of the evidence supporting a conviction, we must interpret the evidence in the light most favorable to the government. We must resolve all conflicts in the evidence in favor of the government, and we must give the government the benefit of every inference which might reasonably be made from the evidence when it is construed favorably to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 77 L.Ed.2d 638 (1983).

Stephens argues his failure to follow the Farm and Home Plan (FHP) did not raise

---

Another $2,000 was paid directly to S & W Farming, Inc. $40,000 was paid to Stephens' brother-in-law purportedly for accounting services. $34,509 was transferred to another corporation, St. Johns Communities, a partially developed subdivision. $21,500 was transferred to Trestle Hill Corporation, an orange grove operation in Florida that was one hundred percent owned Stephens. $19,300 was transferred to Stephens' brother. $3,000 was paid to G.W. Pool Produce, a long-distance trucking venture.

4. The Farm and Home Plan projects the income and expenses of the farming applicant for the period the loan covers. It provides for what purposes loan funds are to be used and includes a debt repayment schedule.

5. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

an inference of intent to defraud because departing from the FHP was the standard operating procedure between CMW and FmHA. The record reveals that Stephens not only failed to comply with the 1978 FHP but that the FmHA local agent did not recommend approval of CMW's 1979 loan because of this non-compliance. A course of dealing is not established from this one instance, however, particularly in light of the fact that the FmHA agent apparently did not condone this departure.

Next, Stephens contends there was no evidence of conversion, and he offered explanations for the three largest items to which loan funds were diverted. These were his personal account, the Chambless purchase, and payments to Connecticut General. Stephens argues that the money transferred to his personal account was actually spent on CMW, but he presented no proof to support this claim. He argues the Chambless purchase was authorized as a capital expenditure. But this argument was totally negated by four facts established in the evidence: First, FmHA had already refused to make any further loans for capital expenditures. Second, the stated purpose of the 1979 loan did not include capital expenditures. Third, Stephens had not requested capital expenditures on the 1979 loan application. Fourth, no capital expenditures were authorized on the FHP.

The payment to Connecticut General for S & W's debt was proper, Stephens argues, because the payment kept the land that secured the note from being made the subject of a successful foreclosure, and the land eventually was sold to satisfy a debt CMW owed to Staple Cotton. The government effectively disputed this claim on several grounds, including the ground that CMW did not owe the debt to Staple Cotton at that time. Stephens' theory is attenuated on its face, and a reasonable juror could well have rejected it.

Finally, Stephens contends that the jury could not have found fraudulent intent because he did not conceal the Florida account transactions, and he cooperated with the government investigation. The fact that Stephens did not cover up his trail of conversion certainly does not conclusively establish a lack of intent. The jury properly could reject Stephens' cooperation argument. An embezzler or other felon is not relieved of his or her crime by cooperating after an investigation of the illicit activity begins. Further, Stephens' cooperation was limited at best. He did furnish selected records and authorize the government to examine CMW's Mississippi bank accounts. Grand Jury subpoenas, however, were necessary to obtain other records. Some records were never made available to the government. Even at trial the government had not had access to the cash disbursement journal upon which the defendant's accountant and expert witness, Mr. Lenahan, based his testimony.

In sum, in support of his claims, Stephens urges factual theories that the jury was free to disbelieve. Our role is not to reevaluate the evidence de novo. *United States v. Villarreal*, 769 F.2d 1044, 1045 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 272, 88 L.Ed.2d 233 (1985). Whether there is intent to defraud is a jury question. *Shale v. United States*, 388 F.2d 616, 618 (5th Cir.), *cert. denied*, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed.2d 445 (1968). The evidence was sufficient to allow the jury to conclude that Stephens acted with the requisite intent to defraud FmHA. The intent of the crime can be shown by the scheme to defraud. *United States v. Netterville*, 553 F.2d 903, 909 (5th Cir.1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978), *quoting United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir.1973), *cert. denied*, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974). The evidence shows that Stephens submitted a false loan application to obtain a FmHA loan and channeled $1,122,786.29 of the loan funds to a secret bank account in Florida. Then, instead of spending the money for the operating and debt expenses of CMW, the stated purpose of the loan, Stephens funneled the money into his personal and individual business accounts or to his creditors, corporations, relatives, and others.

## B. False Statement on Loan Application

Stephens challenges on two grounds the sufficiency of the evidence underlying his conviction for making a false statement on his FmHA loan application, in violation of 18 U.S.C. § 1014.[6] Stephens omitted listing two debts totaling $420,000 and a $7,608 judgment in the financial statement on his FmHA application.

■ Stephens argues that these omissions are not material because the government did not introduce proof that FmHA would not have made the loan if the judgment and the two debts had been disclosed. The argument is specious. The law is clear that the actual impact of the false statement is irrelevant. The focus of § 1014 is not on the effect the false statement had on the institution. *United States v. Shaid,* 730 F.2d 225, 232 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984), *United States v. Johnson,* 585 F.2d 119, 124 (5th Cir.1978). A defendant will not be absolved even if the lending officer states that he was not influenced by the false statements. *United States v. Scott,* 701 F.2d 1340, 1344 (11th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983). As the Supreme Court stated in *Kay v. United States,* 303 U.S. 1, 6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938) (construing antecedent statute to § 1014):

> It does not lie with one knowingly making false statements with intent to mislead ... to say that the statements were not influential or the information was not important.... Whether or not the [covered institution] would act favorably on the loan is not a matter which concerns one seeking to deceive by false information.

■ The focus of § 1014 is on the defendant's intent. The government had to present proof that Stephens made the false statement with intent to influence FmHA. *See, Shaid,* 730 F.2d at 232; *Johnson,* 585 F.2d at 124. Intent can be inferred from the fact that Stephens made statements having "the capacity to influence" FmHA. *Johnson,* 585 F.2d at 124. The extent of Stephens' indebtedness obviously was capable of influencing action on Stephens' loan application. *See, United States v. Pierce,* 733 F.2d 1474, 1178 (11th Cir.1984). We conclude that there was sufficient evidence of materiality.

■ Stephens also falls back upon a claim that the financial statement was not false because the appended financial statement was dated December 31, 1978, and the two omitted loans were incurred after that date. The financial statement dated December 31, 1978 was an attachment to the FmHA loan application which contains its own financial statement on the back. But the loans were made before May 22, 1979, the date of the loan application. The financial statement of the loan application states at the top in one-eighth inch letters "FINANCIAL STATEMENT AS OF DATE OF THE APPLICATION." The jury could properly conclude that the two financial statements together reflected Stephens' financial condition as of May 22, 1979, not December 31, 1978. Stephens had updated in other respects the 1978 statement on the May 22, 1979 form.[7] Further, Stephens was very familiar with FmHA's requirement that the statement had to reflect the financial situation on the date of the application. This was the seventh financial statement that Stephens had filed with FmHA.

---

6. 18 U.S.C. § 1014 provides in pertinent part: Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... the Secretary of Agriculture acting through the Farmers' Home Administration ... upon any application, advance, discount, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

7. Stephens updated the amount of accounts payable from $11,500 on December 31, 1978, to $24,000 on May 22, 1979.

## III. SUMMARY CHARTS

Stephens complains that the district court erred in admitting into evidence on the government's proffer certain charts which constituted summaries of evidence already received. He asserts the charts did not qualify for admission under Fed.R. Evid. 1006 and that he was further severely prejudiced when the court allowed the charts to accompany the jury into the jury room.

This contention involves six summary charts which the government introduced in evidence through a witness who was a special agent with the office of the Inspector General of the United States Department of Agriculture. The witness had prepared them. A separate chart illustrated each of the five counts of mail fraud, and the sixth chart summarized the disposition of the entire loan funds. The charts were approximately three feet by five feet in size and consisted of simple flow charts tracing Stephens' use of the loan proceeds. The sixth chart categorized Stephens' expenditures as either "questioned" or "not questioned." The witness defined "questioned" to mean that as an investigator he questioned the particular use of the loan funds. It is clear that all the records upon which the charts were based were also in evidence.

The trial court overruled Stephens' objections to the admission of the charts in evidence. The court expressly found that the charts were a summaries of "voluminous writings and records which have been introduced into evidence and which cannot be conveniently examined in court by this jury" and thus were properly admitted under Rule 1006. As each chart was introduced, the court instructed the jury that the summary charts did not in themselves constitute evidence in the case, the real evidence was the underlying documents. The judge repeated this instruction in his general charge to the jury, and then the court allowed the summary charts to go into the jury room with the jury. The defendant also had introduced a summary chart, and it as well accompanied the jury into the jury room.

Stephens attacks on two fronts the introduction of the charts into evidence under Fed.R.Evid. 1006.[8] First, he argues that the charts were merely pedagogical devices, not proper Rule 1006 summaries, and second, the charts were argumentative. This Court has noted the importance of distinguishing between charts or summaries as evidence pursuant to Rule 1006, *United States v. Smyth*, 556 F.2d 1179, 1184 (5th Cir.), *cert. denied* 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977) (summaries admitted pursuant to Rule 1006 are evidence) and charts or summaries as pedagogical devices. In *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985), we recognized that pedagogical charts are not themselves evidence, and, absent the consent of all parties, they should not be sent to the jury room with the other exhibits. Relying on *Pierce*, Stephens argues that the charts were pedagogical because they summarize and organize data already in evidence. It is his contention that Rule 1006 is restricted to summaries of writings that cannot feasibly be admitted into evidence.

We reject Stephens' reading of Rule 1006. The language of Rule 1006 is not so restrictive.[9] Rule 1006 does not require that "it be literally impossible to examine

---

**8.** A third contention by Stephens can be rejected out of hand. Stephens urged that the charts were inaccurate because they did not include other deposits he made in the CMW Florida account. The government summary charts reflected the flow of loan funds into each one of two CMW accounts, the Mississippi account and the secret Florida account. Stephens' argument is specious. The charts accurately depicted the use of FmHA loan funds. The charts did not purport to portray all activity in the two CMW accounts.

**9.** Fed.R.Evid. 1006 provides:

The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

the underlying records" before a summary chart may be introduced. *United States v. Scales*, 594 F.2d 558, 562 (6th Cir.1978), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). The fact that the underlying documents are already in evidence does not mean that they can be "conveniently examined in court." *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). Stephens' reading of Rule 1006 is also clearly inconsistent with one proper method of laying a foundation for admission of summary charts—admitting the documentation on which the summary is based. 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 1006[03], p. 1006–7 (1983).

Stephens' reliance on *Pierce* is misplaced. *Pierce* did not hold that charts based upon documents already in evidence are always pedagogical charts and ineligible under Rule 1006. The party in *Pierce* seeking to admit the charts into evidence did not offer the charts pursuant to Rule 1006, so Rule 1006 was not even an issue in the case. Stephens' position runs counter to our decisions that do deal with Rule 1006 charts. In *United States v. Means*, 695 F.2d 811 (5th Cir.1983), we held that a chart based on documents in evidence was properly admitted under Rule 1006. To the same effect are *United States v. Evans*, 572 F.2d 455 (5th Cir.1978), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1979) and *United States v. Smyth*, 556 F.2d 1179 (5th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977).

 Rule 1006 requires (1) the underlying writings be voluminous and (2) in-court examination not be convenient. *Scales*, 594 F.2d at 562. The decision of the trial judge to admit the charts is subject only to an abuse of discretion standard of review. *United States v. Means*, 695 F.2d 811, 817 (5th Cir.1983). There is no abuse of discretion in this case. The evidence was undisputably complex as it involved hundreds of exhibits. Stephens

does not question that the underlying documentation was voluminous. Examination of the underlying materials would have been inconvenient without the charts utilized by the government. *See United States v. Evans*, 572 F.2d at 491; *United States v. Howard*, 774 F.2d 838, 844 (7th Cir.1985).

We also find no merit to Stephens' contention that the charts were argumentative. Stephens objects to the "questioned" and "unquestioned" characterization used in the sixth chart. He claims that the word "questioned" appeared to establish conclusively that the use of the loan funds was questioned. The use of the term, he maintains, improperly shifted the burden of proof to him.

This case is similar to *United States v. Smyth*, 556 F.2d 1179 (5th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977). The government introduced computer printout summaries that contained "original data", "classified data", "falsified data summarized" and "difference between original/false" headings to illustrate how the defendant used forged time cards to overbill the government. The trial court admitted the computer printout into evidence and instructed the jury that the underlying documents were the evidence and that the computer printout summaries were not evidence. We stated, "[I]n light of appellants' objections to the characterizations the Government utilized in the summary headings the cautionary instruction given by the trial judge was entirely appropriate, if not necessary, for it neutralized their possible prejudicial effect." 556 F.2d at 1184.

Like the court in *Smyth*, the court admitted the summary charts into evidence and instructed the jury that the charts were not to be considered as the evidence in the case,[10] and thus, neutralized the possible prejudicial effect of the headings. Moreover, "questioned" falls far short of being as argumentative as "falsified". The use of the term "questioned" is no more than

---

**10.** This practice is consistent with our other cases. *See, e.g., United States v. Evans*, 572 F.2d 455, 495 (5th Cir.1978), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1979).

accurate in a case dealing with alleged conversion of loan proceeds.[11] In sum, we find that the judge properly admitted the summary charts into evidence under Rule 1006, and consequently there was no error in allowing the charts to go into the jury room with the jury.

## IV. VARIANCE FROM THE BILL OF PARTICULARS

■ Stephens claims that the trial court erred in permitting the government to vary its proof and argument from the bill of particulars. The bill of particulars dealt with Count Two which charged Stephens with devising a scheme to defraud the FmHA. As part of that scheme, paragraph 1C of Count Two alleges that Stephens "did ... pretend, represent and promise that the statements in the loan applications were true and correct." The court ordered the government to specify which statements in the loan applications were not true and correct. The government listed sixteen debts of Stephens that he had omitted from his application even though the application required him to list all his debts. At issue is Stephens' alleged $1,016,398.89 debt to Staple Cotton. Stephens' specific complaint is that the government presented proof and argued that CMW's application was false because it omitted the Staple Cotton debt. This is an impermissible variance, Stephens contends, because the government did not state in the bill of particulars that CMW

had omitted a debt to Staple Cotton, but that Stephens had omitted such debt.

Stephens mischaracterizes what occurred at trial. In its case in chief, the government claimed CMW owed no debt to Staple Cotton on May 22, 1979, when CMW's application was submitted. The government's position was at odds with Stephens' defense. Stephens claimed at trial that he did not defraud FmHA by using loan proceeds to make two loan payments to Connecticut General Life Insurance Company totaling $181,153.98 because these payments benefited CMW. Connecticut General was the first mortgagee on Florida property owned by S & W Farming, Inc., a closely held company of Stephens and Wiygul. Stephens' witness, Mr. Lenahan, testified that these two payments to Connecticut General, made on August 1, 1979 and October 22, 1979, indirectly benefited CMW because this payment kept the property from being foreclosed upon and ultimately enabled the property to be sold. Mr. Lenahan claimed this benefited CMW because the proceeds of the sale were applied to CMW's debt to Staple Cotton in April of 1980.

On cross-examination, the government pointed out a flaw in this defense. If CMW owed a debt to Staple Cotton at this time, as the defense claimed, it should have been reflected on CMW's financial application.[12] Lenahan admitted CMW did not list Staple Cotton as a debtor on its application. In closing argument, the government again pointed out the discrepancy in Stephens' defense.[13] The government could properly

---

**11.** Stephens objects to the government's summary witness testifying that certain expenditures and loan funds were "questioned," because this insinuated that the case against Stephens was one of conversion rather than the crime with which he had been charged, devising a scheme to defraud FmHA. Stephens' argument has no merit because the scheme to defraud consisted, in part, of conversion. Paragraph 1E of Count Two charged that Stephens did "convert to his own use Farmers' Home Administration loan funds advanced to pay operating expenses of CMW Land Company."

**12.** The testimony was as follows:
Q. Well, let me ask you this: you say that this was a debt of CMW Land Company that was paid to Staple Cotton? That's your ba-

sic premise, that CMW Land Company owed Staple Cotton this $1,000,000.00?
A. That's—that's the testimony that I've heard, yes, sir.

\* \* \* \* \* \*

Q. Is there a statement on CMW Land Company's application that they owe [SCDC] any money, contingent or otherwise?
A. None.
Q. So, you would say that that has been concealed from Farmers Home Administrator?
A. No Sir.

**13.** The prosecutor stated:
Now, if CMW Land Company owed Staple Cotton and if as a result of owing Staple Cotton that and it owned S & W or had some

bring out on cross-examination an inconsistency in the defense witness' testimony with the other evidence already admitted in the trial. *Cf. United States v. Halperin,* 441 F.2d 612, 617 (5th Cir.1971) (witness may be contradicted on a material point by extrinsic evidence showing a contrary state of facts). In any event, Stephens cannot say he was surprised since he was the one who opened up this line of inquiry by claiming CMW was in debt to Staple Cotton.

## V. EXCLUSION OF TESTIMONY

Stephens contends the trial court erred in excluding certain testimony of the government's criminal investigator. Defense counsel sought to ask the witness if he had asked Stephens during the investigation whether Stephens omitted a recorded judgment from his financial statement. The trial court ruled this proposed testimony was irrelevant. Stephens argues this testimony was relevant to his defense. Although it is not clear, apparently Stephens' defensive theory was that he did not knowingly omit the judgment because he thought the application only called for disclosure of recorded judgments, and he did not know the judgment was recorded. Since the investigator asked a question about recorded judgments, Stephens argues the excluded testimony showed that the investigator thought that the application only required disclosure of recorded judgments, and this led Stephens to the same conclusion.

 The trial court has broad discretion in determining the relevancy of proposed evidence. It is well established that the trial court's ruling on relevancy of evidence will not be disturbed absent a clear showing of abuse of discretion. *United States v. Brown,* 547 F.2d 1264, 1266 (5th Cir. 1977); *United States v. Cohen,* 544 F.2d 781, 786 (5th Cir.), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2175, 53 L.Ed.2d 224 (1977). We find no abuse of discretion in the refus-

al to admit the evidence. The link Stephens wanted to make between the government investigator's question and Stephens' intent when he completed the application was attenuated. *Cf. United States v. Kimmel,* 777 F.2d 290 (5th Cir.1985) (event eighteen months after criminal act gives no indication of defendant's intent at time of crime).

## VI. JURY INSTRUCTION

Stephens objected to the charge instructing the jury on the elements of 18 U.S.C. § 1014. The judge read the text of § 1014 and then instructed the jury:

There are two essential elements which must be proved beyond a reasonable doubt in order to establish the offense prescribed by this law. First, that the defendant knowingly made a false statement or report concerning a material fact to the Farmers Home Administration as charged. And second, that the defendant made the false statement or report willfully and with intent to influence the action of the Farmers Home Administration upon an application, advance, commitment or loan, or any change or extension thereof.

Defendant argues that since § 1014 is a special intent crime he was entitled to the phrase "specific intent" in this instruction.

 We must determine if the charge, considered as a whole, is a correct statement of the law. *United States v. Cronn,* 717 F.2d 164, 170 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3586, 82 L.Ed.2d 884 (1984), *citing, United States v. Grote,* 632 F.2d 387, 391 (5th Cir.1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 98, 70 L.Ed. 88 (1981). The crime charged does require proof of a specific intent. *United States v. Johnson,* 585 F.2d 119, 125 (5th Cir.1978). Although this particular instruction did not contain within itself the language "specific intent," the trial judge elsewhere correctly instructed the jury that the

kind of interest in S & W, would it not appear on the application and the financial statement of CMW Land Company? It would, but it doesn't. So that's an indication that when Mr.

Stephens filed this application in May of 1979, he's not claiming that CMW owed Staple Cotton.

word "willfully" requires specific intent.[14] Considering the instructions as a whole, the trial judge instructed the jury on the elements of § 1014 in full accordance with the requirements of the statutory provision.

A thorough review of the record and all the contentions of Stephens reveals no reversible error. The trial court's judgment is therefore affirmed.

AFFIRMED.

---

**14.** The judge instructed the jury:

The word willfully, as that term will be used from time to time in these instructions, means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids. That is to say, with bad purpose either to disobey or disregard the law.