United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 24, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

06-60487

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KATHLEEN NELSON; ROOSEVELT WALKER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Mississippi
(03-CR-30)

_____

Before JONES, Chief Judge, BENAVIDES and STEWART, Circuit Judges.

BENAVIDES:[*]

The co-defendants, Kathleen Nelson and Roosevelt Walker, were convicted of conspiring with others to murder their acquaintance, Ms. Clovis Reed, in 2003. According to the government, their primary motive was to prevent Reed from testifying against Nelson and others in a bank fraud case. The government charged Nelson with several crimes, including

---

[*] Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

conspiracy to murder.  Roosevelt Walker, who was her long-time boyfriend, was charged only with conspiracy to commit murder.  Several other parties were also involved and have been or will be charged in connection with the murder, but only Walker and Nelson were co-defendants below.

Both Nelson and Walker were convicted of conspiracy to murder and sentenced to life imprisonment.  Nelson was also convicted of conspiracy to commit mail fraud, bank fraud, conversion of money belonging to the United States, and obstructing a grand jury investigation.  For these additional crimes, she received sentences of five, thirty, ten and twenty years, respectively.  On appeal, Nelson raises eleven issues; Walker raises four.  After thorough consideration of all their claims, we AFFIRM the convictions of both appellants.

## I. FACTS

In 1999, Kathleen Nelson, Levon Edmond, and Clovis Reed filed claims in what was known as the "Black Farmers' Settlement," or Pigford-Glickman litigation.  They claimed to be African-American farmers who were discriminatorily denied loans and service by the Farmer's Home Administration.  Only Reed's claim was granted, and she was awarded a $50,000 settlement check.  Someone purporting to be Reed sent a letter to the settlement administrators asking that the check be mailed to Edmond's post office box.  Nelson, meanwhile, went to Edmond's bank and, posing as Reed, had Reed's name added to Edmond's

2

account.  When the check arrived, someone forged Reed's name to it and Edmond deposited it into the Edmond-Reed account.  Years later, on February 5, 2003, Nelson and Edmond, who are sisters, were indicted and charged with aiding and abetting one another in the forgery and conversion of Reed's $50,000 check.  Reed would have been the key witness against them, but she was murdered on April 2, 2003.  On April 7, 2003, the sisters attempted to plead guilty to one count of conversion stemming from the Black Farmers' scheme, but the court refused to accept the pleas.

The government's view is that Nelson and Edmond conspired with two men to murder Reed, in order to prevent Reed from testifying against them.  The first of these men is Roosevelt Walker.  Walker and Nelson had been dating for some time, and Edmond testified at trial that she considered Walker her brother-in-law.  The second man is Walker's uncle and roommate, Joe Collins.  The sisters were close with Collins as well, and even called him their uncle.  Collins had also participated in the Black Farmers' scheme.  At the time of the murder, Walker and Collins were living together in Jackson, Mississippi.  Nelson, Edmond and Reed all lived in nearby Canton, Mississippi.  Edmond accepted a plea bargain in exchange for testifying against Nelson and Walker.[1]

---

[1]As of the date this case was argued, Collins had been indicted but had not yet stood trial.  The government indicated that he was expected to do so soon.

At trial, Edmond testified that on the day of the murder, she, Collins and Walker sat around Edmond's kitchen table and discussed killing Clovis Reed in order to "stop her from talking." Edmond had given several prior statements to that effect, and she adopted them piecemeal on the witness stand. However, when asked whether or not Nelson was present for that conversation, Edmond equivocated. First she stated that Nelson was walking "in and out" of the kitchen while the conversation was taking place. When pressed further on the subject, Edmond stated that Nelson was not present. The prosecutor then pointed out the inconsistency and asked if Edmond was trying to protect her sister. Edmond stated, "Right now I'm worried about myself."

Edmond testified that one scheme the group concocted to kill Reed involved ambushing her at her vehicle, knocking out her window, and beating her up. Additional evidence suggests that this is indeed what happened. First, Edmond testified that Nelson called her on the night of the murder and said that Collins needed some help. Specifically, Nelson asked Edmonds to help her move Reed's truck from where Collins said it was parked, about a half mile from Reed's house. Nelson and Edmond took latex gloves and cleaning materials to Reed's truck and cleaned it so as to remove any fingerprints. While doing so, Edmond saw that the passenger side window had been broken out, and there was glass on the street.

Nelson drove Reed's truck to an apartment complex in

4

Jackson, while Edmond followed in her car.  Edmond testified that she heard Nelson talking to someone on the phone during this trip, and that Nelson stated, "She's not breathing?  Bitch, I know you don't have a body in my truck."  The women then abandoned Reed's truck at the apartment complex, where it was discovered the next day.

The government introduced cell phone records for Walker, Nelson, Collins and Edmond showing that they were communicating with one another in the vicinity of Reed's car between 10:03 P.M. and 11:49 P.M. on April 2.  The records show that Nelson, Edmond and Walker then headed toward Jackson, and that they ended up in the vicinity of the apartment complex where Reed's car was abandoned.  A while later, Walker and Collins called one another while they were in a rural area of Simpson County, near where Reed's body was recovered.

Walker's friend, Larry King, confirmed that Walker and Nelson were in that same area again on April 3, and that Walker told him not to tell anyone that Nelson was with him that day: "If anybody asks, Kathleen Nelson wasn't down here."  Then, on April 4, a local beekeeper discovered Reed's body about 200 or 300 feet from a rural road.  Evidence revealed that the cause of death was blunt trauma to the head, either from a blunt force or a gunshot.  After Reed was dead, someone had removed her head and hands with a large knife.

Edmond saw reports of Reed's murder in the local news, at

which point she met Nelson, Walker and Collins at a hotel and told them about the reports. According to Edmond, Collins got upset and told Walker he had "f****d up." Apparently Collins was upset because Walker was supposed to have moved the body. Walker then "looked stupid and said he should have done it." Edmond also testified that, on another occasion Collins and Walker told her that Collins had cut Reed's head and hands off while Walker held Reed's head.

About two weeks after the murder, Edmond and Nelson asked Warren Holiday, of Rainbow Collision Center, to replace the insert bed liner of Nelson's truck. Holliday testified that the original liner was still in good shape, and that he found it unusual that the women took the old bed liner with them after it was replaced, as most customers allowed Holliday to keep it.

When police began to investigate the four participants, Walker, Nelson and Edmond all initially lied about their whereabouts on the night of the murder. According to Edmond, she and Nelson also convinced Edmond's daughter, Shunterria Wiggins, to appear before the grand jury and lie for them by saying they were at home the night of April 2.

The government elicited these and other facts at trial, and the jury convicted both Nelson and Walker of conspiracy to murder. Nelson was also convicted of conspiracy to commit mail fraud, bank fraud, conversion of money belonging to the United States, and obstructing a grand jury. She was acquitted of

forgery.  Both of the defendants are now serving life sentences.

## II.  DISCUSSION

Nelson and Walker each raise a host of challenges on appeal, totaling fifteen in all.  They are grouped below to avoid repetition.

## A.  THE EXAMINATION OF LEVON EDMOND

### 1.  Did the court admit improper hearsay during the testimony of Levon Edmond?

Nelson first argues that the court improperly admitted one of Edmond's prior statements as substantive evidence.  Defense counsel did not make a contemporaneous objection when the statement was admitted, nor when the government asked about it, so we review them for plain error only.  *See* FED. R. CRIM. P. 52(b).  The government willingly concedes that one of Edmond's prior statements was admitted as substantive evidence, namely Edmond's sworn testimony at her guilty plea on January 12, 2006.  That is the statement in which Edmond describes the planning meeting with Walker and Collins on April 2, and says that Nelson was walking "in and out" during the conversation.

Under FED. R. EVID. 801(d)(1), a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . . ."  The Advisory

7

Note to subsection (d)(1)(A) explicitly states that such prior testimony is admissible as substantive evidence, not merely to impeach. Accordingly, Edmond's statement of January 12, 2006 was rightly admitted as substantive evidence, and we find no error.

### 2. Did the district court err by declaring Edmond a hostile witness?

Walker argues that the court erred in declaring Edmond a hostile witness. Decisions regarding the mode and order of interrogating witnesses, and the use of leading questions, is committed to the discretion of the trial judge by FED. R. EVID. 611. "The matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command." FED. R. EVID. 611(c) advisory committee's note.

Walker's mistakenly suggests that a party cannot have its own witness declared hostile unless the party is "surprised" by that witnesses testimony at trial. This used to be the law in this Circuit. *See United States v. Johnson*, 427 F.2d 957, 960–61 (5th Cir. 1970) (holding that to impeach one's own witness, it is "fundamental . . . that the party offering the witness be really surprised at his testimony") (internal quotation omitted). However, the Federal Rules of Evidence, which postdate *Johnson*, did away with the surprise requirement in the federal courts. *See* FED. R. EVID. 607; *see also United States v. Dennis*, 625 F.2d 782, 795 n.6 (8th Cir. 1980) (explaining transition from common

8

law to Federal Rules, and resulting abandonment of surprise requirement); *United States v. Palacios*, 556 F.2d 1359, 1363 (5th Cir. 1977) (same).

> ### 3.  Did the district court err by allowing the government to impeach Edmond with a prior consistent statement never disclosed to Nelson's counsel?

Nelson's cross-examination of Edmond attempted to show that Edmond had recently fabricated the story of a group meeting at which she, Collins, Nelson and Walker agreed to kill Reed.  The theory was that she had invented the tale to curry favor with the government once the court rejected her initial attempt to plead guilty to conversion on April 7, 2003.  Accordingly, Nelson's counsel tried to show that, prior to that plea attempt, Edmond had never mentioned a meeting at which the conspirators decided to kill Reed.  Unfortunately for Nelson, it appears that Edmond *had* mentioned such a conversation previously, during a meeting with her lawyers and their investigator.  Once the cross-examination was complete, the prosecutor asked Edmond about that prior statement to rebut the implied charge of recent fabrication.  Nelson now complains that the introduction of this evidence was error because the government had not previously notified Nelson of this prior statement.

Once again, defense counsel failed to object to the statement's introduction, so we review for plain error only.  *See* FED. R. CRIM. P. 52(b).  We find that this argument has no merit.

9

First, Edmond denied making the prior statements on re-direct, and the prior statements were not introduced into evidence, so there was no prejudice to Nelson. The only mention of the prior statement was by the prosecutor, which is not evidence. Second, Nelson cites no law indicating when, if ever, a prosecutor must turn over a prior *consistent* statement that it does not (and cannot) use as part of its case-in-chief, and we see no reason to impose such a requirement in this instance.

B. ADDITIONAL EVIDENTIARY RULINGS

### 1. Should Nelson's statement to the FBI have been suppressed?

Nelson made statements to an FBI agent on April 11, 2003. Knowing that the government would seek to introduce those statements at trial, Nelson filed a motion to suppress, arguing that the statements were obtained in violation of her rights under the Fifth and Sixth Amendments. The district court conducted a pre-trial suppression hearing and denied Nelson's motion. On appeal, Nelson renews her claim that the statements were illegally obtained and should have been suppressed. Unfortunately, Nelson did not provide us with the record of the suppression hearing, nor did she cite to any portion thereof, so she has apparently forfeited this claim. *See United States v. O'Brien*, 898 F.2d 983, 985 (5th Cir. 1990) ("It is appellant's responsibility to order parts of the record which he contends contain error and his failure to do so prevents us from reviewing

10

this assignment of error.") (citations omitted).  In any case, what we can glean from the record available to us reveals that this claim is meritless.  The agents were conducting an investigation in its early stages, and inquired of Nelson and Edmond, jointly and at their own residence, about their whereabouts during the first week of April.  It is plain that neither woman was in custody at that point, nor was either woman placed in custody as a result of the interview.  The questioning was preliminary and general in nature.  Eventually the women stated that they wanted to speak to a lawyer, at which time the interview promptly ceased, and no further questioning was conducted.  From our vantage point, limited though it is, we see no reason to suspect that Nelson's rights were violated, nor that suppression was warranted.

2.  Did the district court err by admitting the "to whom it may concern" letter from the Poorman-Douglas file?

The government sought to introduce a letter from Clovis Reed to the Poorman-Douglas Corporation, administrator of the Black Farmers' settlement.  Nelson objected that the letter was hearsay, and the government argued that the letter was admissible as a business record under FED. R. EVID. 803(6), and also that it was admissible under the forfeiture-by-wrongdoing provisions of FED. R. EVID. 804(b)(6).  Nelson says that the court used the latter basis to admit the letter, but required proof of wrongdoing by a preponderance, rather than by clear and

11

convincing evidence. In fact, the court did not state specifically the basis for admitting the letter, but in any case the preponderance standard is the correct one. Nelson's authority to the contrary, *United States v. Thevis*, 665 F.2d 616, 631 (5th Cir. 1982), was overruled by FED. R. EVID. 804(b)(6), so now only proof by a preponderance is required.[2] In any case, Nelson makes absolutely no mention of any prejudice that might have resulted from the introduction of the letter. Accordingly, we need not consider her argument further.

### 3. Did the district court violate Nelson's rights under the Confrontation Clause by limiting Nelson's cross-examination of three government witnesses?

In two instances, Nelson was prohibited from offering her exhibits or pursuing her line of questioning because she sought to elicit expert testimony from witnesses who had not been certified as such. In neither case did Nelson then seek to certify the witnesses as experts. Nelson also complains that she was not allowed to introduce a map of cellular towers during her cross-examination of Scott Baxter, an expert witness on cellular technology. Nelson challenges these three rulings. We note that

---

[2]This is true so long as the objection is rooted in the Federal Rules of Evidence and not the Confrontation Clause. The standard of proof required for a Confrontation challenge may well be higher. *See* Davis v. Washington, 547 U.S. __, 126 S.Ct. 2266, 2280 (2006) (distinguishing between forfeiture on evidentiary and constitutional grounds, and taking "no position on the standards necessary to demonstrate such forfeiture" when constitutional concerns exist).

12

although she mentions the Confrontation Clause in her brief, her argument is evidentiary, not constitutional, in nature. Evidentiary rulings of this sort are reviewed for abuse of discretion. *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004) ("[A] judge's discretionary authority to limit the scope of cross-examination comes into play only after the defendant has been permitted . . . sufficient cross-examination to satisfy the Sixth Amendment.") (citations omitted). To demonstrate an abuse of discretion, the defendant must show that the court's limitation was clearly prejudicial. *Id.* (citation omitted). Nelson has made virtually no effort to illustrate any prejudice that resulted from these rulings, and her argument as to the relevance of the proffered exhibit is not persuasive. It is completely unclear how the prohibited questions and exhibit would have helped her case. The district court was well within its discretion to rule as it did.

### 4. Did the district court err by excluding the transcript of Nelson's earlier plea hearing?

Nelson wanted to introduce the transcript of her April 7, 2003 plea hearing, at which she attempted to plead guilty to theft of Reed's check. Nelson wanted to admit the evidence to show that Nelson was willing to plead guilty to the very offense for which Reed's testimony would have incriminated her, and thus that Nelson had no motive to kill Reed. The court was reluctant to admit the testimony for fear that it was being offered to show

13

that Nelson *intended* to plead guilty.  Nelson's intent, the judge said, was a fact question for the jury.  Instead, the court suggested that the parties stipulate to the fact that a hearing occurred, the purpose of which was for Nelson to plead guilty, but that the court did not accept the guilty plea.  The parties agreed to this stipulation, and thus the defense had its evidence that Nelson attempted to plead guilty.  In light of this resolution, we see no way in which Nelson was prejudiced by the court's decision not to admit the actual transcript, and Nelson has failed to show otherwise.

### 5.  Did the district court err in permitting the government to offer a "showing" of Joe Collins in the courtroom with no opportunity for cross-examination?

During the testimony of Levon Edmond, the government asked permission to bring Joe Collins into the courtroom for a showing and an identification.  The court agreed.  Neither party made a contemporaneous objection.  The government asked Edmond to identify Collins a single time, and then said, "That's all I need, your honor."  The government apparently wished to use Collins' physical appearance as evidence that he was not strong enough to kill Reed and transport her body by himself, so he must have had help.

During Nelson's cross-examination of Edmond, Walker moved for a mistrial based upon Collins' appearance in the courtroom.  Walker argued that it was "nonverbal testimony to associate the

defendant, Roosevelt Walker, to Joe Collins to attempt to corroborate the statements of the witness, Levon Edmond." Nelson joined in the motion for a mistrial. The court responded:

> I don't understand the thrust of the motion. The government asked permission to bring Joe Collins into the courtroom, which I did. He came in. He was dressed in a pair of pants and what looks like a pullover. And he did nothing except stand there as he was identified by the witness. The court discerns nothing about his appearance that would have visited any prejudice upon the defendants. And, therefore, the motion is denied.

On appeal, neither Walker nor Nelson have cited a single case, statute, or other legal basis for the proposition that the showing was error, and we can find none. This argument must fail.

### 6. Did the district court err by precluding Roosevelt Walker from introducing various pieces of evidence related to his defense theory?

Walker's main defense theory was that Joe Collins acted alone in killing Reed. Toward that end, Walker sought to call two witnesses, Fannie Jones and Trudy Berry, who would testify from personal experience about Collins' temper, character for violence, and prior possession of a gun. The district court considered the proffered evidence but ruled it irrelevant to the question of whether or not Walker and Nelson were guilty. We agree. The fact that Collins has a history of violence does not make it more or less likely that Nelson and Walker might have been involved in the crime as well. In any case, the court considered the matter at length, offered defense counsel ample

15

opportunity to present its arguments, and ultimately ruled that the evidence was not relevant.  This was not an abuse of discretion.

<u>C.   NELSON'S REMAINING ARGUMENTS</u>

<u>1.   Is the obstruction statute, 18 U.S.C. § 1512(c)(2), unconstitutionally vague and overbroad?[3]</u>

Nelson argues that the obstruction statute under which she was convicted, 18 U.S.C. § 1512(c), is unconstitutionally vague and overbroad.  She raises this argument for the first time on appeal, and provides no authority for this view, save a general citation to *Wood v. Georgia*, 370 U.S. 375 (1962), a wholly inapposite Supreme Court case that says nothing whatsoever about vagueness or overbreadth.  Nelson's argument is unavailing and rejected.

<u>2.   Did the government prove all of the elements of bank fraud under 18 U.S.C. § 1344(2)?</u>

Nelson argues that the government failed to prove all the elements of bank fraud under 18 U.S.C. § 1344(2), and seems to think that the government was trying to prove the elements of another statute, 18 U.S.C. § 1014, instead.  The government responds that it did prove all of the elements of § 1344.[4]  This

---

[3]In her brief, Nelson erroneously attacks "18 U.S.C. § 1412(c)(2)," which does not exist.  We assume she meant to attack § 1512(c)(2).

[4]18 U.S.C. § 1344 reads: "Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

point of error therefore amounts to a sufficiency of the evidence challenge with regard to the bank fraud conviction.  In considering sufficiency challenges, this Court "must interpret the evidence in the light most favorable to the government." *United States v. Stephens*, 779 F.2d 232, 235 (5th Cir. 1985) (citation omitted).  The conviction must be sustained if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  *Id.* (internal quotation omitted).

18 U.S.C. § 1344 exists to protect financial institutions from fraud, or, more accurately, to protect the government that insures the deposits at those financial institutions.  Therefore, to secure a conviction under that statute, it is not enough to show that the defendant defrauded another *person*, say, by depositing that person's funds into the wrong bank account. Rather, the government must show that the defendant defrauded or intended to defraud a financial institution.  *See United States v. Laljie*, 184 F.3d 180, 189–90 (2nd Cir. 1999); *United States v. Loeffel*, 172 Fed.Appx. 612, 618–19 (5th Cir. 2006) (unpublished

---

       (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representation, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

opinion).  That is, the financial institution must bear the risk of loss.

The issue, then, is whether a reasonable trier of fact could conclude that Nelson's actions knowingly subjected Bank Plus, and not merely Clovis Reed, to a risk of loss.  If so, the conviction should stand.  At trial, the government introduced a copy of the $50,000 check, made out to Clovis Reed, which Edmond and Nelson sought to deposit into Edmond's account at Bank Plus.[5]  The government also introduced a letter from Fleet National Bank to Bank Plus, stating that the $50,000 deposit was fraudulent, and demanding that Bank Plus return the funds.  Lucia Heath, a vice-president at Bank of America (formerly Fleet National Bank), testified to that effect and explained the letter to the jury.  By the time Bank Plus could have returned the funds, Nelson and Edmond had already withdrawn them from the account.  On this evidence, a reasonable trier of fact could have found that Nelson knowingly subjected Bank Plus, and not merely Clovis Reed, to a risk of loss.  *Stephens*, 779 F.2d at 235.

### 3.  Did the district court err by refusing to sever the trials of Nelson and Walker?

FED. R. CRIM. P. 8(b) authorizes joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions

---

[5]Bank Plus was insured by FDIC at the time the check was stolen.

18

constituting an offense or offenses."  "If defendants have been properly joined, the district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence." *United States v. Bermea*, 30 F.3d 1539, 1572 (5th Cir. 1994). Denial of a motion for severance is reviewed for abuse of discretion.  *United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997).  We have considered Nelson's argument for severance and find it unavailing.  She claims that she was prejudiced by the joint trial because much of the government's evidence was directed against Walker individually.  She offers no specific reasons why severance was required in this case, and fails to illustrate any prejudice that resulted to her.  We find no abuse of discretion.

D.  WALKER'S REMAINING ARGUMENT:  Did the district judge impermissibly focus the jury on conviction while explaining the law of conspiracy?

During deliberations, the jury sent a question to the court requesting an explanation of the law on conspiracy.  The court called the jury in and explained the law using language that the parties had previously agreed upon.  The court then elaborated:

> So if you are *persuaded* that there was no conspiracy to kill Clovis Reed, you must find the defendants not guilty of this Count 1.  If you were to find that there was a conspiracy between two or more persons to kill Clovis Reed as charged in the indictment, but that a defendant did not join that conspiracy, you have to find the

19

defendant not guilty. . . .

Walker hangs his hat entirely on the court's use of the word "persuaded," which he says impermissibly shifted the government's burden of persuasion onto the defendants.  Walker reads too much into the court's isolated use of this word in the course of a series of instructions.  "The correct standard of review to be applied to challenges to jury instructions is whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. August*, 835 F.2d 76, 77 (5th Cir. 1987) (citations omitted).  It is undisputed that the judge gave the standard instruction on the burden of proof, which places it squarely on the government.  It would be an inversion of our rule to ignore the full instruction and instead view one small snippet of it in isolation, and we decline the invitation to do so.  Taken "as a whole," we are satisfied that the district court correctly instructed the jurors on the law.

## E.   SUFFICIENCY OF THE EVIDENCE

The lone remaining argument from both parties attacks the sufficiency of the evidence as a whole.  Neither party points to anything specific that was lacking from the government's case. Rather, the parties make conclusory allegations that the evidence against them was merely circumstantial, and that the testimony of

the government's key witness, Levon Edmond, is too unreliable to be believed. However, as noted earlier, when this Court considers sufficiency challenges, it "must interpret the evidence in the light most favorable to the government." *United States v. Stephens*, 779 F.2d 232, 235 (5th Cir. 1985) (citation omitted). The conviction must be sustained if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (internal quotation omitted). Given this standard, we find that the evidence was sufficient to validate the jury's verdict. Neither Nelson nor Walker have pointed to anything that would indicate otherwise, except for the inconsistencies in Edmond's testimony over time. While we agree that Edmond's credibility is suspect, the *jury* "retains the sole authority to 'weigh conflicting evidence and evaluate the credibility of the witnesses.'" *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005) (citation omitted) (emphasis added). We see no reason to disturb their finding on that basis.

### III. CONCLUSION

The convictions of Kathleen Nelson and Roosevelt Walker are hereby AFFIRMED.